UNITED STATES v. GRAHAM et al.
No. 62.

Circuit Court of Appeals, Second Circuit.
March 6, 1939.

John J. Taaffe, of San Francisco, Cal., and Moses Polakoff, of New York City, for appellants Graham and McKay.

Irving Spieler, of New York City, for appellant Allen Comer.

Lewis Landes, of New York City, for appellant Boies Heed.

Lamar Hardy, U. S. Atty., and William Power Maloney and W. Mahlon Dickerson, Asst. U. S. Attys., all of New York City.

Before L. HAND and CHASE, Circuit Judges.

CHASE, Circuit Judge.

William J. Graham, James C. McKay, Allen Comer and Boies Heed, with one other who was acquitted, were tried by a jury on all counts of two indictments, consolidated for trial, in the District Court for the Southern District of New York. The four men named were found guilty on all counts and have appealed.

The first indictment, returned April 19, 1934, charged in three counts the use of the United States mails in furtherance of a scheme to defraud in violation of the provisions of Sec. 215 of the United States Criminal Code (18 U.S.C.A. § 338). Each of the substantive counts was based on a separate letter alleged to have been mailed in Reno, Nevada, and delivered to the addressee in New York City, in the Southern District of New York, by means of the mails. The second indictment, returned March 4, 1935, charged the appellants with having conspired, each with the others and with other persons, some of whom were unknown, to violate the above mentioned statute contrary to the provisions of Sec. 37 of the United States Criminal Code (18 U.S.C.A. § 88). Four overt acts were alleged. Each was the mailing of a letter in Reno, Nevada, which was delivered through the mails to the addressee in New York City. Each of the appellants, except Heed, was sentenced upon each count of each indictment. Heed was not sentenced on the first count of the first indictment.

This was the third trial of appellants Graham and McKay on these indictments, each of two previous trials having ended in a disagreement of the jury as to their guilt. The other two appellants were tried for the first time. Several other persons had before this trial either pleaded guilty or been convicted of like offenses in connection with the swindles involved in this case. It was the claim of the government that appellants Graham and McKay, who were associated in business at Reno, Nevada, had provided in that city protection from the interference by the police with the consummation of many swindles there; that this had been done in furtherance of a widely known conspiracy to defraud in which the mails were used and in return for a share of the proceeds; and that they had actively aided in providing facilities for converting the securities of victims of the frauds into cash which could more easily be taken from them.

There was ample evidence to show that a wide-spread scheme to defraud had been carried out by confidence men during the period covered by the swindles proved in this case; and that at least twenty-four of them were consummated at Reno, Nevada, where the Riverside Bank was often used to enable those defrauded to convert the securities into the cash which was then taken from them by the swindlers by means of what is sometimes called the pay-off game.

In various cities in this country and Canada credulous persons were led to believe that they would receive large sums of money, supposedly won by race-track betting or stock market speculation, which they were deceived into thinking had been carried out partly in their behalf by the confidence men, provided they produced evidence of their financial ability to have paid, if they had lost, to the amount they were permitted to share the winnings. They would agree to do that and would sooner or later always be directed to go to Reno, Nevada, to make their financial showing and be paid. They would go there usually with the evidence of their financial responsibility in the form of securities. There they would be met by the confidence men who had previously worked upon them and be told that only cash would serve. To get the cash, they would usually be directed to sell their securities through the River-

side Bank at Reno. And when this had been done the victims would take their cash to the confidence men who would then display it to the pay-off man together with the fake money they pretended to have provided to make the total equal the sum won. The pay-off man would appear to be satisfied and make what seemed to the victims to be the payment to the confidence men of what was supposedly due and then everything would be risked on one last pretended bet or speculation. That would always be represented as having failed because of a mistake of one of the confidence men in carrying out his instructions and all would seem to be lost, including the money provided by the victims. Then the victims would be persuaded to leave Reno on the promise that restitution would be made and for which, of course, waiting was always in vain.

In the perpetration of the twenty-four frauds where different persons were swindled in the manner described, the same general pattern was followed to entice the victims to Reno; to have them convert their securities into cash; and to take that from them in the way outlined. There was direct evidence that each of appellants Comer and Heed actively participated in at least one such swindle. There was direct evidence that appellants Graham and McKay each assisted the Riverside Bank to provide some of the cash which some of the victims obtained there. And there was sufficient evidence to show a conspiracy to defraud, in the way stated, known to all the appellants at the time they acted to advance the particular swindles in which they were shown to have participated directly and which justified the verdict of the jury that they knowingly helped to carry out a scheme to defraud by the use of the mails. The letters alleged to have been mailed in Reno and delivered in New York through the mails to the addressees there were proved to have been mailed by the Riverside Bank and delivered in New York in making the sale of the securities of some of the victims. There was also evidence that in some instances appellant Graham received the money obtained in the swindle and divided it among the confidence men involved less 15% retained as pay for providing a safe place for the pay-off at Reno; the essential feature of the scheme which he and his business associate McKay were able to contribute because of their influence at Reno. All this, it may be said, was proved by the evidence other than the testimony of one Moore which was taken subject to numerous exceptions. Moore had previously pleaded guilty to the indictment; had been sentenced; and had completed serving his prison term when this trial began.

At the two previous trials of appellants Graham and McKay, Moore had testified at the call of the government to his participation in several of the swindles and had implicated both Graham and McKay. This time he was called as the government's first witness and asked about a so-called Muckenhirn swindle. His memory was faulty and the assistant district attorney undertook to remedy the defect by asking the witness if he had testified at one or the other or both of the two previous trials in accordance with questions put which incorporated what purported to be questions he had been asked at the previous trials and answers to them which he had then given. This method of refreshing his recollection was of little avail though not entirely without result. He did not, however, remember having given any testimony which implicated either Graham or McKay.

Early in the examination, he was asked if he hadn't described "the workings of this pay-off racket" to the examiner on Saturday and replied, "If you will ask me questions I will answer to the best of my ability". At once, the assistant district attorney stated to the court that the "witness's refusal takes the prosecution by surprise". Thereupon he was further examined concerning his former testimony, most of which he said he could not remember. In a little while an objection was made by the defense on the ground that the examination was contrary to the decision in United States v. Block, 2 Cir., 88 F.2d 618. It was overruled and, over the objection and exception of all the defendants, the witness was pressed to state whether he recalled more of his previous testimony but as to much of it he answered that he could not.

When the examination had proceeded in this way to some further extent, the court expressed the opinion that it had gone far enough and reminded the examiner that if he were surprised there were limits. Another question embodying a question and answer purporting to have been given by the witness at a former trial having been answered, "I don't recall it", the court directed the attorney to desist from that. He then said, "I will desist from that and

go to the conclusion of that transaction, if I may, with one other point." After a few more questions had been asked the witness concerning his former testimony and he had failed to remember or said that if he had testified as indicated that it was false, he was asked whether he had testified in 1935 concerning money obtained through a swindle as follows:

"Q. Did you see Mr. Graham take 15 per cent out? A. Yes sir, '15 per cent.' He replied 'It is false, and I was offered executive clemency to make—.'"

At this point he was interrupted by the court and the following occurred:

"The Court: Did you so testify?

"The Witness: I don't remember, your Honor, if I did.

"The Court: If you wish to add to that, did you so testify it was true, or did you so testify it was false. You may say that.

"The Witness: If I so testified, it was false".

■ Up to this point the examination had been conducted by way of impeaching a plainly recalcitrant witness under the assurance given the court by the assistant district attorney that he was surprised. London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325; Curtis v. United States, 10 Cir., 67 F.2d 943. It was a matter for the exercise of sound discretion to permit the attempt to refresh the recollection of the witness and, if that proved futile and the witness was hostile and an active champion of the opposing party, to allow his former contrary statements to be used to discredit him. He was subject to cross-examination by the prosecutor if the court in its discretion permitted. Hickory v. United States, 151 U. S. 303, 14 S.Ct. 334, 38 L.Ed. 170; St. Clair v. United States, 154 U.S. 134, 150, 14 S.Ct. 1002, 38 L.Ed. 936; United States v. Freundlich, 2 Cir., 95 F.2d 376; Di Carlo v. United States, 2 Cir., 6 F.2d 364.

Until the witness made what in the light of later occurrences was an incomplete accusation that he had previously been suborned by the prosecution to commit perjury, his testimony had not been affirmatively prejudicial to the government. He had for the most part either been unable to recall the occurrences concerning which he had formerly testified or had been unwilling to admit that he did. Had the situation remained merely one of the failure to succeed by the means taken to re-

fresh the recollection of the witness, we have no doubt that the court would shortly have enforced the previous warning given the assistant district attorney that he should desist from that kind of examination on the ground of professed surprise.

■ But when the witness made what could only be taken as a direct accusation that he had been induced previously to testify falsely by being offered executive clemency to persuade him to do so, a new issue arose and it was reason enough to justify an extension of the limits of the court's discretionary action to permit the prosecution to proceed further with its attempt to discredit him, if it could, by pressing him even more tenaciously to admit that he had testified in the previous trials contrary to his present testimony and that his former testimony was the truth. The court did just that and the witness admitted some of his previous testimony but as to most of it either said he didn't remember or that if he had so testified it was false. Finally, after he had been examined at considerable length in this way he answered a question by saying "I don't remember. If it is there, I testified to it." He was then told by the court that if he wanted to qualify his answer he could make any explanation which had directly to do with that. He did so by stating that his former testimony had been given under an arrangement made with him by a post office inspector and two assistant district attorneys that if he testified falsely in support of the government's case he would be given executive clemency. This was, of course, the excuse he gave for the fact that his present testimony was so contradicted by the evidence he had before given when called to the stand as a witness in former trials. It had a dual effect. It was both an admission that despite repeated denials that he did not recall his former testimony he had in fact given it for the reason now stated; and that the government had previously resorted to subornation of perjury in its attempt to convict Graham and McKay and was still persisting in that attempt. Such a serious accusation not only called for action by the court to permit the government to show, if it could, that it was false but to advise the court fully as to the facts in order that prompt and adequate measures might be taken if it were true. This was done and under the special circumstances the extent of permissible examination became co-extensive with the scope of the testimony the witness had

formerly given and which he now insisted he had been suborned to give.

While we do not mean to suggest that the defense was bound to disclaim the accusation the witness had made, it is to be noted that it did not but proceeded by cross-examination of the witness and otherwise to make the most of it. It thereby took the opportunity to obtain whatever benefit might accrue and became subject to whatever harm might result if the jury should find the accusation false.

In order to determine whether there had been a fabricated tale concocted by the representatives of the government and given falsely in evidence with their connivance by the witness at the previous trials, it was at the least needful to show what testimony he had previously given. No one could tell whether or not it was false without knowing what it was. And so the examination of this witness as to his former testimony was properly allowed to proceed as it did.

We are urged to find that the element of surprise, professed by the assistant district attorney as the reason for invoking the discretion of the court to permit the witness to be cross-examined, was lacking and that it was error to accept the assurance of the prosecutor without further evidence of the actual fact. Plainly, such an assurance by an attorney to the court was prima facie enough. If, however, its sincerity became questionable further evidence of the fact might have been required. That was also a matter of sound discretion and here we find no abuse of it.

As matters turned out, it became plain enough that the witness had told the assistant district attorney and others before he was called to the stand that he had testified falsely before and would not do so again. It was known, therefore, that he would not be a willing witness. But we see no reason why the district attorney should not have been privileged to believe that when the witness was actually required to testify under oath he would again tell what the attorney believed to be the truth as he had testified before notwithstanding his attempt to dissuade the attorney from calling him again. It was not within the province of the witness, having knowledge of material facts, to decide whether he would give those facts in evidence or not. He was subject to call as a witness and when so called was bound to disclose his knowledge truthfully in response to proper questions. He did not occupy the position of one who had never given the prosecutor any assurance of what facts material to the prosecution he did actually know. He had already testified to those facts twice and his willingness, when placed where he had to tell the truth or be subject to the rigors of the law respecting perjury, to persist in his refusal to testify substantially as he had before may well have surprised the examiner. It was one thing to threaten not to testify and quite another to carry out the threat when actually put to the test. And so we think the court was well justified in accepting the assurance of surprise and permitting the examination to run its course until the accusation of subornation of perjury was made. No doubt that was another and distinct surprise to the prosecution which was dealt with properly as already appears.

Ordinarily, the impeachment of one's own witness goes only to his credibility. Evidence so elicited is not to be treated as affirmative proof of fact for any other purpose. Southern R. Co. v. Gray, 241 U.S. 333, 36 S.Ct. 558, 60 L.Ed. 1030. And the jury should be so instructed. Winchester & Partridge Mfg. Co. v. Creary, 116 U.S. 161, 6 S.Ct. 369, 29 L.Ed. 591. But this evidence became more than impeaching evidence when the issue of subornation of perjury was developed.

If the jury could have been persuaded to believe that the government's representatives in charge of the prosecution had previously tried to convict appellants Graham and McKay by means in part at least of the testimony of Moore which they knew was fabricated, which they, indeed, had aided in fabricating, and were still trying to do so even after Moore had recanted, the basis would have been laid for the same presumption against the government that arises against persons who fabricate, suppress or destroy testimony. Omnia praesumuntur contra spoliatorem. The jury would then have had reason enough for concluding that the prosecutor was conscious that his case against the appellants was lacking in merit and that they were innocent men unjustly accused. The manufacture, destruction, or suppression of evidence in defense of a criminal charge is in the nature of an admission of guilt and, though not conclusive, is to be given consideration as such by the jury. Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895,

40 L.Ed. 1090; Commonwealth v. Webster, 5 Cush., Mass., 295, 52 Am.Dec. 711; Keesier v. State, 154 Ind. 242, 56 N.E. 232; Commonwealth v. Devaney, 182 Mass. 33, 64 N.E. 402.

The principle is equally applicable to the prosecution of a criminal charge. The presumption flowing from the fabrication of evidence is always against the wrongdoer. "In fact, it is as broad as the conceivable circumstances in which it may have logical application". Jones, Ev. Sec. 83. Consequently, as the defense in effect adopted the accusation as its own, the testimony previously given by this witness, in connection with his present evidence given in words and conduct before the jury, became relevant and competent evidence on the issue of the guilt or innocence of the appellants. It was therefore, entirely proper to refuse to limit the extent of the cross-examination to that requisite for impeachment purposes only and equally proper to deny a request to charge such a limitation upon the use of the evidence when the case was submitted to the jury.

The effect to be given the testimony of a hostile witness called by the government and cross-examined by the prosecutor with the permission of the court under circumstances warranting the exercise of that discretion was considered in Di Carlo v. United States, supra. The Di Carlo case, moreover, did not involve former testimony given under oath at a previous trial of the same case or any accusation that a party had fabricated evidence but did have to do with testimony before the grand jury and also contradictory statements previously made by the witness when not under oath. It was held that the jury, having the witness in its presence, "may gather the truth from his whole conduct and bearing, even if it be in respect of contradictory answers he may have made at other times". [6 F. 2d 368.] And what was further then said on this subject is especially in point here:

"The possibility that the jury may accept as the truth the earlier statements in preference to those made on the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court." See, also, Curtis v. United States, supra.

During the examination of the post office inspector who had been accused of suborning Moore, he stated that he had given Moore assurance that he would recommend that consideration be given the fact that he testified in aid of the government and was permitted to say that he then thought Moore was telling the truth. An exception was taken on the ground that the evidence was the inadmissible opinion of one witness as to the veracity of another. The evidence was of course admitted for quite another purpose for it was competent to show that the inspector had acted to assure Moore that if he testified truthfully the inspector would endeavor to have the charges against Moore disposed of in a spirit of appreciation. This explained the inspector's conduct on a basis other than that of having induced him to testify to what the inspector knew was a fabrication.

A witness named Harris testified that he was a convicted swindler who had taken victims to Reno knowing that he would have to pay Graham 15 per cent of the proceeds of the fraud. He testified that he did pay Graham 15 per cent and in explanation of how he knew beforehand that he would have to do that testified: "Well, through prior arrangements and from the known fact throughout the country that that was the general practice". He further testified that his prior arrangements were with Graham and his further testimony to the effect that the percentage was the usual one paid by confidence men for such aid in accord with a general custom was admissible to show the greater probability that the specific arrangements he said he made with Graham were actually made.

In proof of part of the government's case the record kept by the Riverside Bank in the usual course of its business was admitted in evidence to show that on August 15, 1931 a cashier's check for $4,000 payable to appellant, Boies Heed, had been purchased by W. Graham. This was in accord with Wilson v. United States, 2 Cir., 190 F. 427, 436; United States v. Becker, 2 Cir., 62 F.2d 1007. See, also, 28 U.S.C. A. § 695.

It is argued that the proof did not establish one conspiracy as alleged but at most a series of independent frauds and conspiracies which did not link the appellants together as participants in a compre-

hensive agreement' to defraud by using the mails but that is all adequately answered by the great weight of the evidence to the contrary. See United States v. Kissel, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168. In like manner the evidence disposes of the contentions of appellants, Comer and Heed, that their prosecution under these indictments is barred by the statute of limitation. The letters on which the three counts in the first indictment were based were all shown to have been delivered within three years next preceding the finding of the indictment. The conspiracy was a continuing one naturally and, in the absence of affirmative proof that any willful participant therein did withdraw, his continued connection with the business is to be taken for granted. Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas. 1914A, 614.

The cause was submitted to the jury in a clear and concise charge. Though many exceptions were taken to it, none of them are found to point to error.

After the jury had begun its deliberations, a copy of the charge was requested and by direction of the court was sent in to the jury just as it had been delivered in open court. Counsel were not present or previously advised of this action but were later notified and appellants then took exceptions to it. We cannot agree that this is ground for reversal under the well known rule as to communicating with the jury after the cause has been submitted. There was no additional and new communication. Had the jury requested a copy of the charge in open court before it retired to deliberate and the court had seen fit then to comply with the request, there could have been no just cause for complaint. In every practical way the situation remained exactly the same when the request was made and complied with later, and there was nothing prejudicial to the substantial rights of appellants. See 28 U. S.C.A. § 391.

Hon. Willis Van Devanter, a retired Justice of the Supreme Court of the United States, presided at the trial. He was sitting under the special designation of the Chief Justice of the United States made pursuant to the provisions of 28 U.S.C.A. § 375a. His power to sit has been challenged but the exception is overruled on the authority of United States v. Moore, 2 Cir., 101 F.2d 56.

Other exceptions were taken and have been argued on this appeal but we do not find them meritorious or of sufficient importance to require separate discussion.

Judgment affirmed.

NOTE: This decision has been made without the concurrence of Judge MANTON who sat at the argument but resigned before the opinion was written.