Scottie R. ADAMS, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 71A03–0711–CR–256.

Court of Appeals of Indiana.

July 25, 2008.

Transfer Granted Sept. 23, 2008.

Thomas P. Keller, South Bend, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Monika Prekopa Talbot, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-defendant, Scottie R. Adams, appeals his convictions for Voluntary Manslaughter,[1] a class A felony, Carrying a Handgun Without a License,[2] a class A misdemeanor, and the finding that he is a habitual offender.[3] Specifically, Adams argues that the trial court erred in instructing the jury on the offense of voluntary manslaughter when he was charged only with murder and that the trial court abused its discretion in denying his motion for a mistrial. Finding no error, we affirm the judgment of the trial court.

### FACTS [4]

On July 17, 2006, Adams got into an altercation with Christopher White on a street in South Bend. At some point, White said, "Dawg Life ni* *ers been getting they butt whipped over here." Tr. p. 319. Adams, apparently offended by the statement, hit White and knocked him down. White called out for his nephew, "Big Tim," who was on the front porch of a nearby house with several other people. Big Tim ran to White, along with Tony Ramone Cooper, Tony Antone Cooper, Jeremy Lacy, and Dominique Nance. Nance punched Adams in the face. In response, Adams shot Nance in the head

---

1. Ind.Code § 35–42–1–3.

2. Ind.Code §§ 35–47–2–1, –23.

3. Ind.Code § 35–50–2–8.

4. We note that the Table of Contents for Adams's 161–page Appellant's Appendix includes only two entries: "Chronological Case Summary" and "Verification of Appendix." Needless to say, the appendix includes numerous additional items. We remind Adams's counsel that Indiana Appellate Rule 50(C) requires that the table of contents "specifically identify each item contained in the Appendix, including the item's date."

and Nance subsequently died as a result of that wound.

The following day, Adams turned himself in to the police. Adams told one of the detectives that White had said that he was going to "f* * * [Adams] up" and started swinging. *Id.* at 498. Adams stated that he swung back and hit White in the face. Adams then gave the following account of what happened next:

> [A]ll these kids and people coming up, there was like a bunch of people out there just started attacking me. You know, hitting me in the head, and I fell. And then somebody began to kick me, you know, and then I feared for my life. I was really scared, because I know I was going to get hurt again. Then somebody must have dropped a gun or something, I don't know where it came from, but somebody dropped it, I grabbed it and I just covered up while I was shooting, pow, you know, and I just kept running[.]

*Id.* at 499. Adams also claimed that he had seen a gun on the porch where his alleged attackers had been that night. During the interview, the detectives observed that Adams had a mark on his head and a small laceration on his leg.

On July 21, 2006, the State charged Adams with: Count I, murder; Count II, unlawful possession of a firearm by a serious violent felon, a class B felony; and Count III, habitual offender. On April 16, 2007, the State filed an amended information that retained murder as Count I, added Count II, carrying a handgun without a license as a Class A misdemeanor, and Count III, carrying a handgun without a license with a prior felony conviction, a class C felony,[5] and moved the habitual

offender charge to Count IV. At some point before or during trial, the State dismissed amended Count III, carrying a handgun without a license with a prior felony conviction, and moved the habitual offender charge back to Count III.

On September 10, 2007, a jury trial commenced. Adams did not testify on his own behalf, but the taped version of the incident that he gave to police was played for the jury. For the State, Tony Ramone Cooper, Tony Antone Cooper, and Jeremy Lacy all testified that Nance punched Adams, but, contrary to Adams's statements, they testified that Adams did not fall down and that Adams pulled a gun that he was carrying rather than finding a gun on the ground. Also, Lacy testified that after shooting Nance, Adams stood over Nance and said, "That's what you little mother f* * * * * * get." Tr. p. 284.

During its case-in-chief, the State called White to testify. At the time, White was incarcerated for dealing drugs. After a few preliminary questions, White asked, "Can I say something before we start?" *Id.* at 240. Before anyone responded, White continued, "I don't want to testify, because I'm afraid for my kids [sic] life and I'm afraid for my life. So I don't want to testify against nobody." *Id.* The trial court then said, "With that folks, we need to take a quick break, because I need to talk to this witness." *Id.* White added, "I'm afraid for my family's life[.]" *Id.* The trial court said "Hang on a second, sir, hang on" and released the jury. *Id.* Outside the presence of the jury, White's public defender from a separate case stated that the basis of White's concern was that he had been "jumped" in the St. Joseph

---

5. We infer that the original charge of unlawful possession of a firearm by a serious violent felon was dismissed because the predicate felony identified by the prosecutor was burglary as a class C felony, and the relevant statute establishes that burglary is not a "serious violent felony" unless it is a class A or class B felony. I.C. § 35–47–4–5(b)(15).

County Jail "over this incident by people who were in custody." *Id.* at 243. White persisted in his refusal to testify, and the trial court found him in contempt and sentenced him to one year in jail.

Adams's counsel then asked the trial court to declare a mistrial, stating, "I mean, this is a situation where he's saying he doesn't want to testify, he's afraid for his life. And now the jury is seeing that he's not testifying." *Id.* at 251. For his part, the prosecuting attorney said, "I had no idea this was going to happen. I just talked to him last week and we went over how he was going to testify." *Id.* at 252. The trial court chose to admonish the jury instead of declaring a mistrial. The trial court instructed the jury that it could not consider White's comments "in any way as evidence in this case, or consider that in any way in reaching a verdict in this case." *Id.* at 254. All of the jurors indicated that they understood. The trial court then asked, "Are there any of you who think that you could not disregard what Mr. White had to say, and that would influence your ability to be a fair and impartial juror in this case?" *Id.* at 254–55. None of the jurors replied affirmatively.

When it came time to instruct the jury, Adams withdrew an earlier request for an instruction on voluntary manslaughter as a lesser-included offense of murder. The State responded that there was evidence of sudden heat and asked the trial court to give an instruction on voluntary manslaughter. Over Adams's objection, the trial court instructed the jury on voluntary manslaughter. The trial court also instructed the jury on self-defense. Thereafter, the jury found Adams guilty of voluntary manslaughter and guilty as charged on Count II, carrying a handgun without a license as a class A misdemeanor. The jury then reconvened and found Adams to be a habitual offender.

On October 11, 2007, the trial court sentenced Adams to thirty-five years on Count I and one year on Count II, to run concurrently. The trial court then enhanced Adams's sentence by thirty years based on the habitual offender finding, for a total executed sentence of sixty-five years.

Adams now appeals.

## DISCUSSION AND DECISION

### I. Instructions

Adams claims that the trial court erred in instructing the jury on voluntary manslaughter. Specifically, Adams argues that his convictions must be reversed because he did not present any evidence at trial and the State was improperly permitted "to change the nature of its theory of the case." Appellant's Br. p. 5.

In resolving this issue, we note that in *Wright v. State,* 658 N.E.2d 563, 566–67 (Ind.1995), our Supreme Court observed that if one offense is inherently included within another, it is proper for a trial court to give an instruction on the lesser-included offense if there is a serious evidentiary dispute regarding the element that distinguishes the greater offense from the lesser offense. The element that distinguishes murder from voluntary manslaughter is sudden heat, and voluntary manslaughter is an inherently lesser-included offense of murder. *Washington v. State,* 808 N.E.2d 617, 625 (Ind.2004). This court has also determined that although sudden heat is not an element that the State must prove, the State bears the burden of disproving sudden heat if there is evidence in the record to support that finding. *Ross v. State,* 877 N.E.2d 829, 835 (Ind.Ct.App. 2007).

To establish that a defendant acted in sudden heat, the defendant must

774

show "sufficient provocation to engender ... passion." *Johnson v. State*, 518 N.E.2d 1073, 1077 (Ind.1988). The trial court may instruct the jury on voluntary manslaughter if there is evidence of sufficient provocation to induce passion that renders a reasonable person incapable of cool reflection. *Roark v. State*, 573 N.E.2d 881 882 (Ind.1991). Any appreciable evidence of sudden heat justifies an instruction on voluntary manslaughter. *Id.; see also Watts v. State*, 885 N.E.2d 1228 (Ind. 2008) (observing that if there is no serious evidentiary dispute over sudden heat, it is error for a trial court to instruct a jury on voluntary manslaughter in addition to murder).

In this case, the evidence established that White approached Adams and made a statement that offended Adams. Tr. p. 319. In response, Adams hit White and knocked him down. During an interview with police officers on July 18, 2006, Adams claimed that individuals who had been standing on a nearby porch ran to the scene and "started attacking [him]." *Id.* at 499. One of the individuals punched Adams in the face, causing Adams to stumble. Adams then stated that he was scared and that "somebody must have dropped a gun [so] I grabbed it and ... covered up while ... shooting, ... and I just kept running." *Id.* at 499, 512–13, 517–18, 529–30.

As discussed above, Adams initially asked for an instruction on voluntary manslaughter but withdrew the request after the presentation of the evidence. *Id.* at 569. After the State argued that the evidence established the existence of sudden heat, the trial court gave the instruction on voluntary manslaughter over Adams's objection. *Id.* at 574.

■ We note that Adams does not dispute that he acted in sudden heat. Rather, he argues that because the State did not amend the information to include a charge of voluntary manslaughter, the instruction should not have been given, inasmuch as Adams did not present any evidence at trial. Appellant's Br. p. 9–11. Notwithstanding this contention, we have found no authority suggesting that a lesser-included offense instruction cannot be given in instances where the defendant decides not to present any evidence at trial. Indeed, the decision announced in *Wright* and the cases decided thereafter make no distinction between instances where a defendant presents evidence and those in which the defendant does not. Moreover, Adams initially asked for a voluntary manslaughter instruction, thus demonstrating that the inclusion of such an instruction was not a surprise to him. Tr. p. 569.

In sum, because the evidence showed that Adams may have acted under sudden heat when he shot Nance, the trial court properly instructed the jury on the offense of voluntary manslaughter. Also, because Indiana law does not distinguish between circumstances where a defendant presents evidence at trial and those where a defendant does not, Adams's argument that the jury was improperly instructed fails.

## II. Mistrial

Adams next argues that his convictions must be reversed because the trial court abused its discretion in denying his motion for mistrial. Specifically, Adams maintains that the trial court's admonishment to the jury after White commented that he would not testify because he feared for his safety and that of his family was not sufficient to overcome the prejudicial impact on the jury. Put another way, Adams claims that a mistrial was warranted because "the damage had been done, and could not be undone." Appellant's Br. p. 13.

In resolving this issue, we note that a mistrial is an extreme sanction that is warranted only when no other cure can be expected to rectify the situation. *Agilera v. State*, 862 N.E.2d 298, 308 (Ind.Ct. App.2007), *trans. denied.* Whether to grant or deny a motion for mistrial is a decision left to the sound discretion of the trial court. *Id.* at 307. We will reverse the trial court's ruling only upon an abuse of that discretion. *Id.* Moreover, we afford the trial court such deference on appeal because the trial court is in the best position to evaluate the relevant circumstances of an event and its impact on the jury. *Id.*

To prevail on appeal from the denial of a motion for mistrial, the appellant must demonstrate that the statement or conduct in question was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. *Id.* We determine the gravity of the peril based upon the probable persuasive effect of the misconduct on the jury's decision rather than upon the degree of impropriety of the conduct. *Id.* at 307–08. Finally, we note that "reversible error is seldom found when the trial court has admonished the jury to disregard a statement made during the proceedings because a timely and accurate admonition to the jury is presumed to sufficiently protect a defendant's rights and remove any error created by the objectionable statement." *Id.* at 308.

We have previously addressed situations in which the jury may have been left with the impression that the defendant was responsible for a witness's fear. For instance, in *Keyser v. State*, 160 Ind.App. 566, 312 N.E.2d 922 (1974), the defendant was tried for murder. During the direct examination by the prosecutor of the only witness who testified regarding the State's version of the killing, the witness indicated that he had changed his story because he had been threatened and had been offered $3,000. *Id.* at 923. However, there was no evidence presented connecting the alleged threats or the bribe to the defendant. *Id.* at 924. Defense counsel objected and asked to have the comments stricken from the record. *Id.* at 923. The trial court sustained the objection, struck the witness' comments, and ordered the jury to disregard the comments. *Id.* Unsatisfied, defense counsel asked for a mistrial. *Id.* The trial court again instructed the jury to disregard the witness' comments but denied the defense's motion for a mistrial. *Id.* at 923–24. The defendant was ultimately convicted of the lesser-included offense of voluntary manslaughter. *Id.* at 923.

On appeal, we noted that "[t]he manufacture, destruction, or suppression of evidence in defense of a criminal charge is in the nature of an admission of guilt and, though not conclusive, is to be given consideration as such by the jury." *Id.* at 924 (citing *United States v. Graham*, 102 F.2d 436, 442 (2d Cir.1939), *cert. denied*, 307 U.S. 643, 59 S.Ct. 1041, 83 L.Ed. 1524 (1939)). We also observed that because "a criminal defendant is the primary individual who could benefit from the bribing or absence of a witness who might testify against him, the inference is strong that he has procured these acts when evidence of them is introduced at his trial." *Id.* However, there was no evidence that the defendant, Keyser, was involved in the attempt to alter the witness's testimony. *Id.* Thus, we concluded that "the attempted removal of the resulting prejudice through an instruction to the jury was inadequate to expiate the effect of the testimony," especially in light of the fact that the State's entire case depended upon the testimony of the witness in question. *Id.* As a result,

we reversed the defendant's conviction and ordered a new trial. *Id.*

Seven years later, we relied heavily on *Keyser* when we decided *Cox v. State*, 422 N.E.2d 357 (Ind.Ct.App.1981). In *Cox*, over the defense's objection, the trial court allowed a witness to testify regarding threats made against him by unknown persons while he was incarcerated. *Id.* at 361. The witness testified that he was told that he would not live long if he testified against "Coy Cox." *Id.* However, there was no testimony suggesting that Cox was responsible for or had any knowledge of the threats. *Id.* The jury found Cox guilty of theft. *Id.* at 359.

On appeal, we made the following observations:

> Generally, threats made against a witness by the defendant are in the nature of an attempt to manufacture or suppress evidence and are therefore viewed as an admission of guilt. A threat is said to be at least an attempt to conceal evidence bearing upon a defendant's guilty knowledge. In the case of potential prosecuting witnesses it may also be regarded as an admission of guilt. Although such threats are not viewed as conclusive admissions, their relevance on the issue of guilt normally renders them proper for jury consideration.

> Since threats tend to show guilty knowledge or an admission of guilt on the part of the defendant, a proper foundation must be laid showing the threats were made either by the defendant or with his or her knowledge or authorization. As stated in 1 Wharton's Criminal Evidence § 217 (13th ed. C. Torcia 1972), "[a] threat by a third person against a public official or witness is relevant only if the defendant is linked in some way to the making of the threat." (Emphasis added.) *Id.* at 465. Thus, evidence of threats made by unidentified third per-

sons usually lacks a sufficient connection to the defendant to render them admissible. Barring such a showing, the highly prejudicial nature of such testimony requires its exclusion.

*Id.* at 361–62 (citations omitted, formatting altered, footnote omitted). We concluded that the trial court erred in admitting the threat testimony "where there was no evidence Cox had knowledge of or had authorized the threats." *Id.* at 362.

■ Here, the evidence established that after White commented that he would not testify in light of safety concerns, the trial court called a brief recess. Tr. p. 240–41. Thereafter, the trial court admonished the jury not to consider White's statement as evidence "or consider [it] in any way in reaching a verdict." *Id.* at 254. All of the jurors then conveyed to the trial court that they could disregard White's comments and remain fair and impartial. *Id.* at 254–55.

Unlike the circumstances in *Keyser*, where the prosecutor purposefully elicited the threat testimony, the prosecutor in this case was unaware that White would make the comments at issue. Moreover, in *Cox*, the trial court affirmatively admitted the improper threat testimony into evidence over the defendant's objections. *Id.* at 360. As a result, we held that the trial court's *"improper admission of such highly prejudicial testimony* was reversible error in this case since, among other things, the State failed to connect the making of such threats to Cox." *Id.* at 361 (emphasis added).

The trial court here, however, was just as surprised as the prosecutor when White volunteered his comments. Additionally, there was no evidence suggesting that Adams knew of the alleged threats that were made to White or that Adams was in any way connected to them when White

volunteered the statements in open court. Even more compelling, White did not mention any specific threats that were made against him in front of the jury, and at least three witnesses testified that Adams pulled a gun and shot Nance. And, as discussed above, Lacy testified that Adams remarked, "That's what you little mother f* * * * *s get," immediately after the shooting. *Id.* at 284. As a result, the State presented the testimony of several witnesses in proving its case against Adams. *See Keyser,* 160 Ind.App. at 569, 312 N.E. 2d 922 (recognizing that the adequacy of a jury admonishment may not suffice in an instance where, among other things, the State's *entire case* depended upon the testimony of the witness who was allegedly threatened and bribed) (emphasis added).

In light of these circumstances, it is apparent that the admonishment to the jurors, coupled with the jurors' acknowledgment to the trial court that they could disregard White's comments in reaching a verdict, sufficiently removed any prejudice that might have inured to Adams. In other words, Adams has failed to demonstrate that White's comments had a prejudicial impact on the jury to the extent that a mistrial was warranted. Therefore, we conclude that the trial court properly denied Adams's motion for a mistrial.

The judgment of the trial court is affirmed.

ROBB, J., concurs.

RILEY, J., dissents with opinion.

Judge, RILEY, dissenting with separate opinion.

I respectfully dissent. In affirming the trial court's denial of Adams' motion for mistrial, the majority emphasizes that "there was no evidence suggesting that Adams knew of the alleged threats that were made to White or that Adams was in any way connected to them." Slip op. at 12. But that is exactly the point. The law here, as quoted by the majority, could not be more clear: "Since threats tend to show guilty knowledge or an admission of guilt on the part of the defendant, *a proper foundation must be laid showing the threats were made either by the defendant or with his or her knowledge or authorization.*" *Cox,* 422 N.E.2d at 361–62. "Barring such a showing, the highly prejudicial nature of such testimony requires its exclusion." *Id.* at 362. No such showing was made in this case.

The majority also stresses that "White did not mention any specific threats that were made against him in front of the jury[.]" Slip op. at 12. But our supreme court, citing *Cox,* has found that such a distinction is of no moment. In *Smith v. State,* 765 N.E.2d 578, 587 (Ind.2002), *reh'g denied,* the court noted that it had before it "only testimony that the witnesses feared they might be harmed if they testified, not that they had been threatened." Nonetheless, the defendant argued that the testimony "left the jury with the impression that he was a killer who was likely to retaliate against a witness." *Id.* The court agreed, concluding, "Without a showing tying these fears to Smith, [the admission of this testimony] is error—for the same reason other unspecified threats are improper." *Id.*

Finally, the majority notes that the prosecutor was unaware that White would make the comments that he did and that the trial court was just as surprised as the prosecutor when White volunteered his comments. Nonetheless, the holdings in *Keyser* and *Cox* were not premised on the degree of impropriety of the conduct of the prosecutors or the trial court judges but rather on the probable persuasive effect on the jury's decision, which is how we meas-

ure the gravity of the peril. *See Agilera,* 862 N.E.2d at 307–08. In this regard, the overarching principle, as stated in *Keyser,* is the same: "Since a criminal defendant is the primary individual who could benefit from the bribing or absence of a witness who might testify against him, the inference is strong that he has procured these acts when evidence of them is introduced at his trial." 312 N.E.2d at 924. And barring evidence linking the defendant in some way to the making of the threats, the highly prejudicial nature of such testimony requires its exclusion. *Cox,* 422 N.E.2d at 362; *see also Dudley v. Duckworth,* 854 F.2d 967 (7th Cir.1988) (citing *Keyser* and *Cox* in granting petition for writ of habeas corpus based on threat evidence that was unconnected to defendant), *reh'g denied, cert. denied,* 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989).

It seems, then, that there were only two ways in which the necessity of a mistrial might have been avoided: presenting the jury with evidence showing that Adams was somehow responsible for placing White in fear, or establishing that Adams was in no way connected to White's fears (which probably would have been difficult, considering that White said that he was jumped over "this incident"). But White never returned to testify, and the State produced no evidence tending to either associate or disassociate Adams with White's fears. As such, the trial court should have granted Adams' motion for mistrial. Instead, the trial court attempted to remove the resulting prejudice by admonishing the jury to disregard White's comments, but under the circumstances, the admonishment, as in *Keyser,* was "inadequate to expiate the effect of the testi-

mony." *See Keyser,* 312 N.E.2d at 924. In particular, the fact that White was gone when the jury returned to the courtroom and did not return to testify left the jury free to speculate that Adams is a dangerous man, so dangerous, in fact, that the trial court was either unable to or unwilling to force White to testify against him, or, as our supreme court phrased it in *Smith,* that Adams is a killer who is likely to retaliate against a witness. 765 N.E.2d at 587. Given the highly prejudicial nature of this sequence of events, I would conclude that the trial court abused its discretion by denying Adams' motion for mistrial.

The question then becomes whether the trial court's error was harmless. The State's one-sentence argument in this regard, as one could imagine, is not terribly persuasive. In determining whether the erroneous admission of evidence was harmless, the burden on the defendant is not to conclusively demonstrate that the error caused the verdict to be what it was and that it would have been otherwise had the error not occurred; rather, the defendant must show the error placed him in a position of grave peril to which he should not have been subjected. *White v. State,* 257 Ind. 64, 272 N.E.2d 312, 319–20 (1971). In other words, the question is not whether there is sufficient evidence to support the conviction absent the erroneously admitted evidence, but *whether the improper evidence was likely to have a prejudicial impact on the jury, thereby contributing to the verdict rendered. Cox,* 422 N.E.2d at 363. Adams has met this burden.

With regard to the killing of Nance, the jury found Adams not guilty of murder[6] and therefore had two options: finding

---

**6.** We know the jury acquitted Adams of murder because it found him guilty of voluntary manslaughter. *See Watts v. State,* 885 N.E.2d 1228, 1232 (Ind.2008) ("[I]t has long been held in Indiana that a conviction for voluntary manslaughter is an acquittal of the greater offense of murder.").

Adams guilty of voluntary manslaughter or acquitting him based on self-defense. Given that choice, the jury had to determine whether Adams was acting under sudden heat (voluntary manslaughter) or acting under a reasonable belief that deadly force was necessary to prevent serious bodily injury (self-defense using deadly force). *See* I.C. §§ 35–42–1–3 (voluntary manslaughter) and 35–41–3–2(a) (self-defense using deadly force). Obviously, this line can be a fine one. That is, a jury could reasonably attribute the same action to either sudden heat or the fear of serious bodily injury.

In such cases, the jury often must decide whom to believe, and evidence suggesting that the defendant is a bad or dangerous person (who was not merely acting in self-defense) could easily tip the scales. Here, for example, Adams claimed in his interview with police that "a bunch of people ... started attacking [him]" and "hitting [him] in the head," that he fell, that "somebody began to kick [him]," that he "feared for [his] life," and that he "was really scared[.]" (Tr. p. 499). It is undisputed that Adams was hit in the head, and the laceration on his leg could support a reasonable inference that he absorbed additional blows. If the jury had believed Adams' story, it might have found that he acted in self-defense. However, White's fear of testifying and the fact that he was not compelled to testify may very well have swayed the jurors by painting Adams as a bad or dangerous person. Because this case was a close one-close enough to convince the trial court to instruct the jury on self-defense-the trial court's erroneous denial of Adams' motion for mistrial was not harmless with regard to the voluntary manslaughter conviction.

The same goes for Adams' conviction for carrying a handgun without a license. In an interview with police, which was admitted into evidence, Adams claimed that he found the gun on the ground and picked it up merely to defend himself. Other witnesses testified that Adams was carrying the gun and pulled it out after Nance hit him. Again, Adams' character for violence was relevant to this factual dispute, and White's comments and subsequent absence from the trial likely raised the inference that Adams was a bad person (the kind of person that would carry a gun without a license). The trial court's erroneous denial of Adams' motion for mistrial was not harmless as to the conviction for carrying handgun without a license.

In sum, I would reverse Adams' convictions and the habitual offender finding, and I would allow the State to retry Adams. I do not reach this conclusion lightly. I acknowledge the time and money it takes to conduct a retrial. In any event, our primary concern should be whether Adams was substantially prejudiced by White's comments and his subsequent failure to testify. As discussed above, I believe that he was. Because I would reverse Adams' convictions on this ground, I would not reach his argument regarding the jury instructions.