## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 19 2017, 5:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kristin A. Mulholland
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gentry Hervie Jackson, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | June 19, 2017 <br><br> Court of Appeals Case No. 45A03-1609-CR-2032 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Salvador Vasquez, Judge <br><br> Trial Court Cause No. 45G01-1508-MR-4 |

**Barnes, Judge.**

## Case Summary

[1] Gentry Jackson appeals his conviction for murder. We affirm.

# Issues

The issues before us are:

   I.     whether the trial court properly allowed the State to present evidence of an alleged threat made to one of its key witnesses by Jackson's wife;

   II.     whether there is sufficient evidence of the necessary mens rea for a murder conviction; and

   III.     whether there is sufficient evidence to support the jury's rejection of his self-defense claim.

# Facts

Jackson is married to Michelle Jackson. Previously, Michelle was married to Alec McCloud for eight to nine years and had five children with him. Two of those children were Justin McCloud and Alexis McCloud Rogers; Justin was twenty-two at the time of trial, and Alexis was nineteen. Michelle asserted that Alec had been abusive towards her during their marriage, and Alec and Jackson had a very antagonistic relationship. Alec was not welcome at Jackson's residence.

On August 3, 2015, Alexis was living with Jackson and Michelle in Gary. Justin also was at the house that day. At some point on that day, before the sun went down, Alexis returned to the house from an outing and had to knock on the door because she did not have a key. As she was knocking, she saw Alec drive up to the house in his mother's car. Alexis had not spoken to Alec for

months and was surprised to see him. Justin opened the door for Alexis and also saw Alec parked outside; he had spoken to Alec earlier and was aware he was in town.

[5] Alexis got into an argument with Michelle after going into the house and mentioning to Justin that their father was outside. Justin went outside while Alexis and Michelle continued arguing. When Michelle noticed that Alec was outside, she yelled at Alexis, "why did [you] bring him over here." Tr. Vol. I p. 136. Alexis noticed Jackson go into his bedroom, come back out carrying a gun, and go outside. As Jackson walked past Michelle, she said, "make sure that's him." *Id.* at 141. Justin could see that Alec was on his phone, sitting in the car, when Jackson approached the car and said, "I got you now." *Id.* at 79. Justin did not see anything else in Alec's hands besides his cell phone. Jackson then began shooting at the car and eventually fired a total of eight shots. Alec began driving away as Jackson opened fire.

[6] Alec drove for a short distance before wrecking the car. Justin and a friend of his arrived on the scene shortly thereafter. Justin and his friend saw Alec's phone in his lap and nothing else, such as a gun. Police never recovered a gun from Alec or the car. There were five bullet holes in the driver's side front door and one in the rear door. Alec suffered gunshot wounds to his back, abdomen, and buttocks. After undergoing emergency surgery, Alec died.

[7] After the shooting, Jackson took the chamber out of the gun, called 911, reported the shooting, and waited for police to arrive. While waiting, Michelle

told Alexis, "Look what you made my husband do. My husband better not go to jail." *Id.* at 157. When police arrived, Jackson told them he had shot Alec because he had seen Alec point a gun at him.

[8] In Alexis's first statement to police immediately after the shooting, she said that Alec had called Jackson to the car and that she saw Alec holding a gun. She also said Alec may have shot first. Alexis also made similar statements to defense counsel. However, at the end of December 2015, Alexis went to the police station with Alec's mother and said she had lied in her earlier statements, and that in fact from where she was standing she could not see if Alec was holding anything in his hands. Alexis explained that she felt pressured to lie because of Michelle's perceived threat to her that Jackson "better not go to jail." *Id.*

[9] The State charged Jackson with murder. Before his jury trial, Jackson filed a motion in limine to prevent the State from presenting evidence of Michelle's threatening statement to Alexis. Initially, the trial court granted this motion but later reversed itself. The State presented evidence of Michelle's statement during its direct examination of Alexis to explain why some of her pretrial statements differed from later statements and her trial testimony that she did not see Alec holding a gun. Before Alexis's testimony on this point, the trial court instructed the jury:

> We are about to go into a line of questioning where the witness will be allowed to testify to certain statements attributed to her mother, Michelle. Now, typically these are hearsay statements.

It would not be admissible, but in this instance, in hearings conducted outside your presence, they are now deemed to be proper and admissible to show the witnesses, this witness' state of mind and her beliefs at the time that she's receiving these statements from Michelle. They are not intended to prove that the statements are actually made. If the intent is to show what this witness' state of mind was at the time of receiving the statements were Michelle. I also inform you that these statements attributed to her mother, Michelle, are not attributed to the defendant.

*Id.* at 151-52. Defense counsel also questioned Alexis about her inconsistent pretrial statements during cross-examination.

[10] Jackson testified on his own behalf at trial. He claimed that Alec asked him to approach the car, and as he did so, Alec raised a gun and pointed it at him. Jackson said he then pulled his gun out the waistband of his pants and began firing it at the car, not really aiming, as he ran backwards and attempted to take shelter behind his own car. The jury found Jackson guilty as charged, and the trial court sentenced him accordingly. Jackson now appeals.

## Analysis

### I. Admission of "Threat" Evidence

[11] The first issue is whether the trial court properly allowed Alexis to testify that she felt threatened by statements Michelle made immediately after the shooting, which caused her to initially make false statements about the shooting to police and defense counsel. "We review evidentiary rulings for abuse of discretion resulting in prejudicial error." *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015).

An abuse of discretion occurs if a ruling "is either clearly against the logic and effect of the facts and circumstances before the court, or when the court misinterprets the law." *Id.* We may affirm a decision regarding the admission of evidence if it is sustainable on any basis in the record. *Johnson v. State*, 6 N.E.3d 491, 499 (Ind. Ct. App. 2014). Also, we will disregard any error in the admission of evidence unless it affects the substantial rights of a party. *Id.* In determining the prejudicial effect of an evidentiary ruling on a party's substantial rights, we consider the probable impact of the improperly-admitted evidence on the fact finder. *Id.* "Any error caused by the admission of evidence is harmless if the evidence was cumulative of other, appropriately admitted, evidence." *Id.*

[12] Before the trial court, Jackson lodged two specific objections against Alexis relating what Michelle had told her: (1) it was inadmissible hearsay, and (2) its unfair prejudicial effect outweighed its probative value under Indiana Evidence Rule 403.[1] On appeal, Jackson does not attempt to argue that Alexis's testimony regarding Michelle's statements was inadmissible hearsay. *See Fox v. State*, 497 N.E.2d 221, 226 (Ind. 1986) (holding testimony that witness had made prior inconsistent statements because of threats against his family was admissible under "state of mind" exception to hearsay rule). Jackson argues only that the evidence was inadmissible under Evidence Rule 403. He is correct

---

[1] Evidence Rule 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

that *Fox* did not address the probative value of such evidence versus its prejudicial effect, nor does it appear the trial court addressed the Evidence Rule 403 issue. Still, we may affirm the trial court's ruling on any basis supported by the record. *See Johnson*, 6 N.E.3d at 499.

[13] When analyzing a claim of evidence being inadmissible under Evidence Rule 403 for being too unfairly prejudicial, the inquiry is whether the probative value of the proffered evidence is outweighed by the likely unfair prejudicial impact of that evidence. *Myers v. State*, 33 N.E.3d 1077, 1109 (Ind. Ct. App. 2015), *trans. denied*. "'When determining the likely unfair prejudicial impact, courts will look for the dangers that the jury will (1) substantially overestimate the value of the evidence or (2) that the evidence will arouse or inflame the passions or sympathies of the jury.'" *Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012) (quoting *Carter v. State*, 766 N.E.2d 377, 382 (Ind. 2002)), *trans. denied*. The general admissibility of evidence of threats against a witness has been addressed in several cases. Most of these cases predate the adoption of the Indiana Rules of Evidence and Rule 403 specifically; still, they are helpful in evaluating the issue of the unfair prejudicial effect of such evidence versus its probative value.

[14] Our supreme court has stated, "evidence pertaining to bribery, threats and other influences which reflect upon the credibility of a witness should be given to the jury. . . . Moreover, such evidence should not be viewed as being collateral in nature." *Hardin v. State*, 275 Ind. 63, 65–66, 414 N.E.2d 570, 572 (1981). Shortly after *Hardin*, this court held, "[s]ince threats tend to show guilty

knowledge or an admission of guilt on the part of the defendant, a proper foundation must be laid showing the threats were made either by the defendant or with his or her knowledge or authorization." *Cox v. State*, 422 N.E.2d 357, 361–62 (Ind. Ct. App. 1981). "Thus, evidence of threats made by unidentified third persons usually lacks a sufficient connection to the defendant to render them admissible. Barring such a showing, the highly prejudicial nature of such testimony requires its exclusion." *Id.* at 362. The main concern in *Cox* appeared to be that the State was implying certain threats made against a witness while incarcerated were instigated by the defendant, without any evidence to that effect. *See Adams v. State*, 890 N.E.2d 770, 776-77 (Ind. Ct. App. 2008) (distinguishing *Cox* in part because there was no evidence defendant knew of or was connected to threats against victim and State did not prompt witness to relate threats on stand), *trans. denied*.

[15]     *Kimble v. State*, 451 N.E.2d 302 (Ind. 1983), addressed a situation in which the trial court allowed the State to question a witness on re-direct examination about threats made to him in prison by friends of the defendant, without the *Cox* foundation of proof that the defendant knew of or authorized the threats. Our supreme court affirmed, holding defense counsel had opened the door on cross-examination to such evidence by leaving a false or misleading impression about why the witness wanted to avoid going to certain prisons as part of a plea deal with the State. *Kimble*, 451 N.E.2d at 306. We also note that Indiana Evidence Rule 613(b) now provides, "Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or

deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." This rule does not require the presentation of evidence in any particular order regarding the prior inconsistent statement and explanations or denials of the statement. *See Griffith v. State*, 31 N.E.3d 965, 970-71 (Ind. 2015).

[16] After considering the caselaw surrounding this issue, as well as Evidence Rules 403 and 613(b), we cannot say the trial court abused its discretion in permitting Alexis to relate the perceived threat Michelle made against her. Clearly, it related to explanation of prior inconsistent statements Alexis made regarding whether she saw Alec holding a gun before Jackson began shooting. Without the testimony about the threat, the jury would have had an incomplete and misleading picture about Alexis's pretrial statements. The testimony about the threat had probative value as an explanation of Alexis's prior inconsistent statements. Moreover, the trial court expressly instructed the jury that Michelle's threat was hers and hers alone and was not attributable to Jackson. Thus, the apparent concern of cases such as *Cox*—that the State may attempt to sneak in an evidentiary harpoon of implied uncharged misconduct by the defendant or an admission of guilt—is absent here. Although the testimony about the threat may have been prejudicial to Jackson's case, we cannot say that it was so *unfairly* prejudicial or encouraged the jury to consider improper factors in considering Jackson's guilt or innocence such that it was inadmissible.

[17] Additionally, under our current evidence rules, it was not error for the State to bring up Michelle's threat during Alexis's direct examination, rather than waiting for the defense to question her about prior inconsistent statements during cross-examination and then to question her about the threats during re-direct examination or rebuttal. As noted, Evidence Rule 613(b) does not require any particular order in the presentation of evidence.[2] The Seventh Circuit, in addressing the Federal Rules of Evidence, has addressed a situation similar to this, and held it is proper for the government to anticipate that the defense will attempt to introduce evidence of a witness's prior inconsistent statements and to "front" such cross-examination by admitting evidence during direct examination that the witness had been threatened by the defendant to make false pretrial statements. *United States v. Holly*, 167 F.3d 393, 394-95 (7th Cir. 1999). Although not binding upon us, a federal court's interpretation of the Federal Rules of Evidence, which generally are similar to the Indiana Rules of Evidence, is useful. *Griffith*, 31 N.E.3d at 969. In sum, *Holly* and the way the trial court proceeded here are consistent with our rules of evidence. The trial court did not err in allowing the State to question Alexis about Michelle's threat to her.

---

[2] A party cannot call a witness for the sole purpose of impeaching them and presenting otherwise inadmissible evidence. *Griffith*, 31 N.E.3d at 973. The State did not call Alexis for the sole purpose of impeaching her, but primarily to elicit her testimony that she did *not* see Alec holding a gun and for other evidence related to the shooting.

## II. Sufficiency of the Evidence—Mens Rea

[18] Next, we address whether there is sufficient evidence Jackson acted with the mens rea required to support a conviction for murder; Jackson contends that, at the most, he acted recklessly in shooting Alec. When analyzing a claim of insufficient evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). "It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction." *Id.* The evidence does not have to overcome every reasonable hypothesis of innocence, and it is sufficient if an inference may reasonably be drawn to support the verdict. *Id.*

[19] To convict Jackson as charged, the State was required to prove that he knowingly or intentionally killed Alec. *See* Ind. Code § 35-42-1-1(1). The requisite intent to kill may be inferred from the nature of the attack and the circumstances surrounding the crime. *Kiefer v. State*, 761 N.E.2d 802, 805 (Ind. 2002). Also, intent to kill may be inferred from the use of a deadly weapon in a manner likely to cause death or great bodily harm. *Id.*

[20] Jackson's argument is largely dependent upon the version of events described in his testimony, namely that he fired wildly at Alec's car after he saw Alec holding a gun and while Jackson attempted to take cover behind his own car. This testimony conflicts in large measure with other evidence, including Justin's testimony. Justin testified clearly that Jackson ran up to Alec's car, said "I got you now," and began firing at the car. Tr. Vol. I p. 79. Justin saw Alec

holding a cell phone and nothing else; no gun ever was found on Alec's person or in his car. Jackson continued firing at Alec's car as he drove away and did not stop until Alec turned a corner. All in all, Jackson fired eight shots, and at least six of them struck the car. This evidence is indicative of a deliberate intent to kill Alec and is sufficient to sustain his conviction for murder. *See Allen v. State*, 575 N.E.2d 615, 616 (Ind. 1991) (holding that firing multiple shots at moving car, at least two of which struck car, was sufficient evidence of intent to kill); *Ware v. State*, 859 N.E.2d 708, 725 (Ind. Ct. App. 2007) (holding there was sufficient evidence of intent to kill where defendant fired gun at group of fleeing boys and said he was "going to get" them), *trans. denied*. Jackson's argument is an invitation to reweigh the evidence and judge witness credibility, which we must reject.

### III. Sufficiency of the Evidence—Self-Defense

Finally, we address Jackson's claim that he was acting in self-defense in shooting Alec. We review such claims as we do any other sufficiency claim: we neither reweigh the evidence nor judge witness credibility. *Cole v. State*, 28 N.E.3d 1126, 1136-37 (Ind. Ct. App. 2015). A person is justified in using deadly force against another person "if the person reasonably believes that the force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony." I.C. § 35-41-3-2(c). The State has the burden of negating a claim of self-defense once it is raised and has support in the record. *Cole*, 28 N.E.3d at 1137. "The State may meet this burden by rebutting the defense directly, by affirmatively showing the defendant did not

act in self-defense, or by simply relying upon the sufficiency of its evidence in chief." *Miller v. State*, 720 N.E.2d 696, 700 (Ind. 1999). Whether the defense has been rebutted is a question for the trier of fact. *Cole*, 28 N.E.3d at 1137.

[22] As with his mens rea argument, Jackson's self-defense claim is dependent upon acceptance of his trial testimony that he only began shooting at Alec when he saw Alec point a gun at him. This is in direct contravention of Justin's testimony that he only saw Alec holding a cell phone, and the failure to find a gun on Alec's person or in his car. Justin's testimony that Jackson said "I got you now" before opening fire also supports the conclusion that Jackson began firing not out of fear of Alec, but as some sort of revenge for years of conflict between them and between Alec and Michelle. Tr. Vol. I p. 79. Finally, even if Jackson had some initial fear of Alec, there is evidence that Alec himself did not have a gun, let alone that he ever fired it at Jackson, yet Jackson fired eight shots, at least six of which struck Alec's car, and continued firing at Alec even after he began to drive away. In other words, Jackson continued firing long after any threat posed by Alec disappeared. There is sufficient evidence to support the jury's rejection of Jackson's self-defense claim.

## Conclusion

[23] The trial court did not abuse its discretion in allowing the State to elicit testimony from Alexis that Michelle had threatened her, thus causing Alexis to make false pretrial statements. There is sufficient evidence Jackson had the requisite mens rea to commit murder and was not acting in self-defense when he shot Alec. We affirm.

Affirmed.

Kirsch, J., and Robb, J., concur.