# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**FREDERICK VAIANA**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE MODESITT COOPER**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

Apr 10 2014, 9:19 am

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL JOHNSON, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  49A02-1307-CR-562 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Lisa F. Borges, Judge
Cause No. 49G04-1301-FB-1370

**April 10, 2014**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

STATEMENT OF THE CASE

Michael Johnson ("Johnson") appeals his convictions for: (1) Class B felony criminal confinement;[1] (2) Class B felony criminal confinement; (3) Class B felony rape;[2] (4) Class C felony battery;[3] (5) Class D felony intimidation;[4] (6) Class D felony strangulation;[5] and (7) Class A misdemeanor interfering with the reporting of a crime.[6]

We affirm.

ISSUES

1. Whether Johnson knowingly, voluntarily, and intelligently waived his right to a jury trial on all of his charges.

2. Whether the trial court abused its discretion in denying Johnson the right to cross-examine the victim about past sexual conduct.

3. Whether the State presented sufficient evidence to prove beyond a reasonable doubt that Johnson committed Class B felony rape and Class D felony intimidation.

FACTS

As of January 2013, Johnson had been in a relationship with his girlfriend, I.B., for seven years and had lived with her in Marion County, Indiana since the previous September. On January 4, 2013, Johnson and I.B. spent the day together but then separated. I.B. told Johnson she was going to go back to their home, but instead she went

---

[1] Ind. Code §§ 35-42-3-3(a)(1); (b)(2)(B).

[2] I.C. § 35-42-4-1(a).

[3] I.C. § 35-42-2-1(a)(3).

[4] I.C. §§ 35-45-2-1(a)(2); (b)(1)(A).

[5] I.C. § 35-42-2-9.

[6] I.C. § 35-45-2-5.

out and did not return home until 3:00 or 4:00 a.m. the next morning.  When she returned, Johnson was asleep and I.B. got into bed.

At that point, Johnson got up and "started going crazy," accusing I.B. of cheating on him with their neighbor.  (Tr. 17).  He called her "a nasty bitch" and began "talking shit."  (Tr. 18).  I.B. denied his accusations and told him that he could call the neighbor if he wanted to verify that she had not cheated on him.  In response, Johnson continued to yell at I.B., including the statement:  "Bitch, you're a fuckin' liar. Crack head."  (Tr. 18).  Then he poured a beer on her and told her to leave the house.

When I.B. refused to leave, Johnson grabbed her by the hair and began punching her.  Johnson punched her head more times than she could count.  I.B. told him to stop and that she had not cheated on him, but Johnson did not stop.  Although I.B. "felt like [she] was about to die" and told Johnson that she was about to pass out, Johnson responded "I don't give a fuck bitch."  (Tr. 21).  As a result of the blows, I.B. felt "pain" and "dizziness."  (Tr. 22).  Johnson then threw her from one side of the bed to the other and grabbed her throat.  I.B. gestured that she could not breathe, but Johnson continued to hold her by the throat with one hand and punch her with his other hand.

Johnson finally released I.B. and told her to call the people with whom she had spent the evening.  He also told her that he had received a text message picture of her naked with somebody else.  When I.B. asked to see the picture, though, Johnson would not show it to her.  I.B. called the people as Johnson had requested, but she was not able to reach anyone.  After I.B.'s attempted calls, Johnson took her phone away and did not give it back to her for the rest of the night.

Subsequently, Johnson began punching I.B. again and told her "how much he hated [her]" and how she had "destroyed his life." (Tr. 25). I.B. tried to block Johnson's punches by taking a fetal position on the floor, yet Johnson continued to punch her, causing bruises on her arms. He also punched her head and kicked her in the eye. I.B. repeatedly asked Johnson to stop, but he did not.

Next, Johnson pulled I.B. up by her hair and ripped off her clothing. He dragged her across the room and threw her down the steps, telling her: "Bitch, get the fuck out of my house." (Tr. 31). At that point, I.B. was in extreme pain, which she rated as a "ten" on a scale of one to ten. (Tr. 31). She attempted to come back up the steps, but Johnson threw her back down again and then dragged her through their kitchen, dining room, and living room. Throughout this time, Johnson continued to hit I.B. She attempted to hold onto the couch but lost her grip, and Johnson threw her outside. I.B. was not wearing any clothes and was "freezing cold" because there was snow on the ground. (Tr. 34).

I.B. saw one of her neighbors coming down the street in a van and ran to the van to get help. She told the neighbor "Help me. Help me. He's about to kill me," and asked the neighbor to call the police. (Tr. 34). Johnson, however, came around the van and told the driver, "Man, she's just drunk." (Tr. 35). In response, the driver rolled up his window and told I.B. that he could not help her. I.B. then continued to run down the street and came across another car. She asked the people in the car for help, but Johnson said that they should "[m]ind [their] business," and they left. (Tr. 36).

Johnson grabbed I.B. and led her back inside. He told her to "[g]et [her] ass in the shower," but he had to help her into the shower because she was too injured to get in by

4

herself. (Tr. 37). During the shower, I.B. kept blacking out and had trouble standing. Afterwards, Johnson helped her out and told her to go to bed. Once she was in bed, he told her to "turn around" because he wanted to have sex with her. (Tr. 39). I.B. said that she did not want to have sex, but Johnson told her again to turn around. I.B. did what Johnson had asked because she was "afraid" and "didn't want to get beat[en] [any] more." (Tr. 40, 41). Johnson and I.B. had intercourse, and, afterwards, I.B. attempted to sleep but had trouble because she was in too much pain. Instead of sleeping, she kept falling in and out of consciousness like she had in the shower.

The next morning, Johnson started crying and apologized to I.B. for his actions the night before, and I.B. believed that Johnson was sorry. She and Johnson again had sex, and this time it was consensual. Later that day, they both went to pick up furniture for their house. Throughout that time, I.B. was "[i]n so much pain" and had marks and bruises on her arms, face, head, and legs. (Tr. 44). Johnson had to help her do everything.

When they returned home, I.B. told Johnson that she needed to go to the hospital. He told her to call her sister for a ride and said she should tell her sister that she had gotten robbed at a bank cashing a check. Later, I.B.'s sister picked I.B. up to take her to the hospital and noticed that I.B. was limping and had bruises around her eye and on her face. I.B.'s sister asked Johnson who had injured I.B., and he said, "Well, I wasn't here." (Tr. 78). On the way to the hospital, I.B. told her sister what had really happened. They also stopped at McDonald's, but I.B. had trouble eating because her jaw was locked.

5

At the hospital, I.B. met with a police officer and told him what had happened. Officers then took pictures of I.B.'s injuries, including bruises and cuts on her left eye, arms, back, hip, ankle, hands, legs, and behind her ears. They also went to I.B.'s home and arrested Johnson.

On January 9, 2013, the State charged Johnson with: (1) Class B felony criminal confinement; (2) Class B felony criminal confinement; (3) Class B felony rape; (4) Class C felony battery; (5) Class D felony intimidation; (6) Class D felony strangulation; and (7) Class A misdemeanor interfering with reporting of a crime. After his arrest, Johnson called I.B. from jail and told her "not to show up and be honest in court." (Tr. 69). Johnson also sent I.B. a letter from jail in which he told her to tell the court that she had lied and had just been mad when she made her accusations.

On March 13, 2013, Johnson filed a verified waiver of trial by jury that he and his attorney both signed. Although the waiver contained a provision stating "I understand that I have an absolute right to a jury trial in this *case*," another provision stated, "I understand that I am charged with the offense(s) of," and only listed Johnson's lead charge—Class B felony criminal confinement. (App. 47) (emphasis added). The waiver did not list the rest of Johnson's charges.

That same day, the trial court held a hearing on the waiver and questioned Johnson regarding his understanding of the rights he was waving. Johnson affirmed that he had read over the waiver with his lawyer, understood what he was charged with, understood what a jury trial was, and understood that by waiving his right to a trial by jury, he couldn't get it back in his "case." (Tr. 4). Based on these questions and others, the trial

6

court determined that Johnson had knowingly and voluntarily waived his right to a jury trial.

On May 17, 2013, the trial court held a bench trial. Johnson never objected on the ground that he had not waived his right to a trial by jury on all of his charges. During the trial, I.B. testified. On direct examination, the State asked her whether Johnson had ever threatened to kill her, and I.B. responded that while Johnson was hitting her he said "Bitch, I'll kill you." (Tr. 42). On cross-examination, Johnson's counsel asked I.B. how often she and Johnson had sex when they lived together. The State objected on relevance grounds, and the trial court sustained the objection. Next, Johnson's counsel asked whether Johnson had ever asked her to turn over and have sex before that day, and the State again objected on relevance grounds. Johnson's counsel responded, "it's cross-exam. It's very relevant," but the trial court sustained the objection. (Tr. 71). Johnson's counsel did not make an offer to prove.

At the conclusion of the presentation of evidence, the trial court found Johnson guilty of both counts of Class B felony criminal confinement; Class B felony rape; Class D felony intimidation; and Class A misdemeanor interference with reporting a crime. The trial court also found Johnson guilty of Class C felony battery and Class D felony strangulation, but took those two charges under advisement to determine whether they were lesser included offenses. Subsequently, on May 28, 2013, the trial court entered a judgment of conviction on all of the charges, including the two it had previously taken under advisement.

On June 4, 2013, the trial court held a sentencing hearing. At the conclusion of the hearing, it sentenced Johnson to twenty (20) years each for his criminal confinement convictions and his rape conviction; eight (8) years for his battery conviction; three (3) years each for his intimidation and strangulation convictions; and one (1) year for his interference with reporting a crime conviction. The trial court also ordered all of the sentences to run concurrently, except for the rape conviction, which it ordered to run consecutively to the other counts. In aggregate, the court sentenced Johnson to forty (40) years executed in the Department of Correction. Johnson now appeals.

<u>DECISION</u>

1. <u>Waiver of Right to Jury Trial</u>

Johnson's first argument on appeal is that he did not knowingly waive his constitutional right to a jury trial on all of his charges. Although Johnson signed and filed a written waiver of jury trial, provision number 3 of the written waiver provided "I understand that I am charged with the offense(s) of: Criminal Confinement FB." (App. 47). Neither this provision nor the rest of the waiver mentioned any of Johnson's six additional charges. Accordingly, he now argues that he only knew he was waiving his right to a jury trial on the criminal confinement charge and expected to have a jury trial on the remaining counts.

Both the United States Constitution and the Indiana Constitution guarantee the right to a trial by jury. *See* U.S. CONST. amend. VI (guaranteeing "the right to a speedy and public trial, by an impartial jury" in all criminal prosecutions); IND. CONST. art I, § 13 (guaranteeing the right to "a public trial, by an impartial jury," in all criminal

8

prosecutions). It is fundamental error to deny a defendant a jury trial unless there is evidence of the defendant's knowing, voluntary, and intelligent waiver of the right. *Gonzalez v. State*, 757 N.E.2d 202, 205 (Ind. Ct. App. 2001), *trans. denied.* "'A voluntary waiver occurs if the conduct constituting the waiver is the product of a free will; a knowing waiver is the product of an informed will; [and] an intelligent waiver is the product of a will that has the capacity to understand . . . .'" *Duncan v. State*, 975 N.E.2d 838, 842-43 (Ind. Ct. App. 2012) (quoting *Eldridge v. State*, 627 N.E.2d 844, 846 (Ind. Ct. App. 1994), *trans. denied*). In addition, the defendant must express his personal desire to waive a jury trial, and such personal desire must be apparent from the record. *Poore v. State*, 681 N.E.2d 204, 206 (Ind. 1997). We will presume that a defendant has not waived the right to a jury trial unless he affirmatively acts to do so. *Id.* at 207.

Essentially, Johnson is arguing here both that he did not knowingly waive his right to a jury trial of the charges not listed on his written waiver and that he did not affirmatively act to waive them. We do not find either of these arguments persuasive. There are multiple factors that are relevant in determining whether a waiver is knowing and whether there has been an affirmative act. Among others, a defendant's filing of a signed jury trial waiver adequately reflects a personal desire to waive this right and constitutes the affirmative act necessary to do so for a felony charge.[7] *Coleman v. State*, 694, 278 N.E.2d 269 (Ind. 1998). A defendant may also express the desire to waive a jury trial through a colloquy in open court. *See O'Connor v. State*, 769 N.E.2d 1230,

---

[7] The Indiana Supreme Court has not specifically enunciated a more stringent standard for reviewing the waiver of rights derived from Indiana's state constitution than the U.S. Supreme Court has for the United States Constitution. *See Gonzalez*, 757 N.E.2d at 206.

1234 (Ind. Ct. App. 2003). Further, we have held that a lawyer's signature on a waiver implies that the defendant acted upon the advice and information of legal counsel. *Poore*, 681 N.E.2d at 207.

Although Johnson's written waiver only listed one of his charges, other aspects of the written waiver indicate that Johnson intended to waive his right to a jury trial with respect to his entire case. First, the charge that the waiver listed—Class B felony criminal confinement—was the lead, most serious, charge. It seems unlikely that Johnson would waive his right to a jury trial on his most serious charge and not on the rest. Second, all of Johnson's charges were a part of the same cause, and provision number 4 of the waiver states, "I hereby give up my constitutional rights to a trial by jury and ask that *the case* be tried by the Court without a jury." (App. 47) (emphasis added). Under the plain language of this provision, Johnson agreed to waive his right to a jury trial of the entire *case*, not merely Class B felony criminal confinement. Third, Johnson's attorney signed the waiver, which indicates that Johnson acted on the advice and information of his legal counsel when filing his waiver.

In addition to the written waiver, the case's legal proceedings indicate that Johnson intended the court to try all of his charges. On March 13, 2013, the trial court held a hearing on the waiver and engaged Johnson in an in-court colloquy. It asked him, among other questions, whether he had gone over the written waiver with his attorney; whether he understood what he was charged with; and whether he understood that by waiving his right to a trial by jury he could not get it back. Johnson responded

10

affirmatively to each of these three questions, including that he knew he could not get back a jury trial in his "case." (Tr. 4).

Johnson also failed to object to being tried on all of his charges during his bench trial on May 17, 2013. In defense of this oversight, he cites to *Perkins v. State*, 541 N.E.2d 927 (Ind. 1989), for the proposition that "the fact that a defendant submits to a bench trial with defense counsel at their [sic] side is insufficient to constitute a valid waiver of that defendant's right to a trial by jury." (Johnson's Br. 13). However, in *Perkins*, unlike here, there was no additional evidence that the defendant had ever been advised of his right to a jury trial or that he had ever waived that right either orally or in writing. *See id.* at 928. *Perkins* stands for the proposition that we may not infer waiver based on a defendant's submission to a bench trial alone. *Perkins* does not prevent us from interpreting submission to a bench trial as one piece of evidence, among others, supporting a waiver. Here, Johnson had the opportunity to object to the bench trial yet did not give any indication that there was an error, in spite of the State's admission of evidence relating to all of his charges and the trial court's entry of a verdict on all charges.

In light of all of these factors, we conclude that Johnson knowingly waived his right to a jury trial on all of his charges, rather than just Class B felony criminal confinement. Even if, arguendo, one of the above factors alone might not be conclusive, together they constitute persuasive evidence that Johnson made an informed choice and intended his written waiver to apply to the whole case.

2. Denial of Cross-Examination Questions

11

Next, Johnson argues that the trial court abused its discretion when it denied him the right to cross-examine I.B. about her past sexual conduct. On cross-examination, Johnson's counsel asked her "how often did you and [Johnson] have sex during the time you were living together?" (Tr. 70). The State objected to the question's relevance, and the trial court sustained the objection. Shortly thereafter, the following exchange occurred:

> [DEFENSE COUNSEL:] You mentioned the part when you were laying [sic] in bed and he told you to turn over, correct?
>
> [I.B.:] Mm-hmm, yes.
>
> *****
>
> DEFENSE COUNSEL:] Okay. Ha[d] he ever asked to do that before that day?
>
> [STATE:] Objection, relevance.
>
> [DEFENSE COUNSEL:] Your Honor, it's cross-exam. It's very relevant. And when—
>
> [STATE:] Whether or not he asked her to turn over before that day for sex is not relevant as to whether or not he was guilty of rape on that day.
>
> [TRIAL COURT:] Sustained. Next question, please.

(Tr. 71). Johnson now contends that the trial court should have allowed these questions because they were relevant for establishing Johnson's relationship with I.B. and for determining whether I.B. consented to sex. In response, the State argues that Johnson waived these arguments by failing to follow the proper procedure for admitting evidence of prior sexual conduct.

The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the trial court's decision only for an abuse of discretion.

12

*Rhodes v. State*, 996 N.E.2d 450, 454 (Ind. Ct. App. 2013). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

The State's argument focuses on Evidence Rule 412, which generally prohibits the introduction of evidence of prior sexual conduct of an alleged victim of a sex crime. There are certain exceptions to Rule 412, including where the evidence relates to the victim's prior sexual conduct with the defendant. *See Conrad v. State*, 938 N.E.2d 852, 855 (Ind. Ct. App. 2010). However, even if an exception to Rule 412 applies, the defendant must submit a written motion that includes a description of the evidence at least ten days before trial in order to offer evidence of past sexual conduct during the trial. *See id.* This is because Rule 412 "'is intended to prevent the victim' of a sexual assault 'from being put on trial . . . and, importantly, to remove obstacles to reporting sex crimes.'" *Id.* (quoting *Williams v. State*, 681 N.E.2d 195, 200 (Ind. 1997)). It reflects the insight of Indiana's Rape Shield Statute—codified at Indiana Code § 35-37-4-4—that "'inquiry into a victim's prior sexual activity is sufficiently problematic that it should not be permitted to become a focus of the defense.'" *Id.* (quoting *Williams*, 681 N.E.2d at 200). The State contends that, even though I.B.'s prior sexual conduct falls within an exception to Rule 412 because the conduct relates to the defendant, Johnson could not submit the evidence because he failed to submit a written motion concerning the evidence prior to trial.

Johnson does not deny that he failed to submit a written motion as required by Rule 412. He claims, though, that we should ignore this omission because the State

13

objected on the grounds of relevancy, rather than his failure to abide by the procedural requirements. We disagree. As the State notes, we may affirm a trial court's decision regarding the admission of evidence if it is sustainable on any basis in the record. *Barker v. State*, 695 N.E.2d 925, 930 (Ind. 1998), *reh'g denied.* Because it is clear that Johnson did not follow Rule 412's procedural requirements, we conclude that he was precluded from introducing evidence of I.B.'s prior sexual conduct at trial and has waived the issue on appeal.[8]

Notwithstanding waiver, we need not address the merits of Johnson's arguments because we find that even if the trial court did abuse its discretion by excluding the testimony on relevance grounds, the error was harmless. *See Turner v. State*, 953 N.E.2d 1039, 1058-59 (Ind. 2011) (stating that Indiana courts will not reverse a conviction based on a harmless error). Generally, we are to disregard errors in the admission of evidence unless they affect the substantial rights of a party. *Id.* at 1059. In viewing the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable impact on the fact finder. *Id.* Any error caused by the admission of evidence is harmless if the evidence was cumulative of other, appropriately admitted, evidence. *Allen v. State*, 994 N.E.2d 316, 319 (Ind. Ct. App. 2013).

Johnson argues that his questions for I.B. were relevant to establish their relationship and to demonstrate that their sexual conduct was consensual on other occasions. However, other, properly admitted, evidence served these same purposes.

---

[8] The State also argues that Johnson waived his argument for failing to make an offer to prove. However, we will not address this argument in detail since we find waiver on other grounds.

I.B. testified that she and Johnson had dated each other for seven years and lived together, which demonstrated the intimate nature of their relationship. I.B. also testified that they engaged in consensual sex within twenty-four hours of the incidents in question. In light of this testimony, Johnson's attempted cross-examination would not have elicited probative evidence. Accordingly, without addressing Johnson's argument in full, we conclude that even if the trial court did err, it was a harmless error for which we will not reverse.

3. Sufficiency of the Evidence

Finally, with respect to the sufficiency of the evidence, Johnson makes two arguments: (1) that there was insufficient evidence to convict him of rape because his intercourse with I.B. was not compelled by force or the imminent threat of force; and (2) that there was insufficient evidence to convict him of intimidation because the State did not prove that he threatened to kill I.B. as a result of a prior lawful act. The standard of review for sufficiency of the evidence claims is that this Court should only reverse a conviction when reasonable persons would not be able to form inferences as to each material element of the offense. *Perez v. State*, 872 N.E.2d 208, 212-13 (Ind. Ct. App. 2007), *trans. denied.* We do not reweigh evidence or judge the credibility of witnesses. *Id.* at 213. In addition, we only consider the evidence most favorable to the verdict and the reasonable inferences stemming from that evidence. *Id.*

A. *Rape*

In order to convict Johnson of rape, the State was required to prove beyond a reasonable doubt that he "knowingly or intentionally [had] sexual intercourse with a

15

member of the opposite sex when: . . . the other person [was] compelled by force or imminent threat of force[.]" I.C. § 35-42-4-1(a). Johnson argues that the State did not provide sufficient evidence to prove that he compelled I.B. to have intercourse with him "by force or imminent threat of force" because there is no evidence that he communicated any type of threat to I.B. in order to influence her actions. *See id*. He notes that, instead, prior to going to bed with I.B., his actions were non-threatening—he helped her take a shower and get into bed. In response, the State argues that Johnson's violent actions towards I.B. prior to the intercourse were sufficient to place her in fear that there would be an "imminent threat of force" if she did not comply with Johnson's wishes.

In *Tobias v. State*, 666 N.E.2d 68, 72 (Ind. 1996), the Indiana Supreme Court elucidated the standard for analyzing whether a defendant has compelled action through an imminent threat of force. It clarified that

> it is the victim's perspective, not the assailant's, from which the presence or absence of forceful compulsion is to be determined. This is a subjective test that looks to the victim's perception of the circumstances surrounding the incident in question. The issue is thus whether the victim perceived the aggressor's force or imminent threat of force as compelling her compliance.

*Id.* The Supreme Court has also previously held that "[f]orce or threat of force may be shown even without evidence of the attacker's oral statement of intent or willingness to use a weapon and cause injury, if from the circumstances it is reasonable to infer the attacker was willing to do so." *Lewis v. State*, 440 N.E.2d 1125 (1982), *cert. denied*.

Here, over the course of the night, Johnson grabbed I.B. by the hair, kicked her in the eye, and punched her more times than she could count, to the point where she "felt like [she] was about to die" and felt "pain" and "dizziness." (Tr. 21-22). While he

16

kicked her, he told her: "Bitch, I'll kill you." (Tr. 42). He also took her clothes off and made her leave the house in the freezing cold. As a result of Johnson's actions, I.B. was having trouble standing and was blacking out shortly before he told her to turn over for sex. When I.B. testified, she stated that she had sex with Johnson because she was afraid and "didn't want to get beat [any] more." (Tr. 40). In light of these circumstances, we conclude that the State produced sufficient evidence to prove that Johnson compelled I.B. to have intercourse with him by imminent threat of force and, thus, committed rape.

B. *Intimidation*

Johnson's final argument is that the State did not produce sufficient evidence to support his conviction for Class D felony intimidation because it did not prove that he threatened to kill I.B. in retaliation for her performance of a lawful act. Pursuant to Indiana Code § 35-45-2-1(a)(2), a person commits intimidation if he or she "communicates a threat to another person, with the intent: . . . (2) that the other person be placed in fear of retaliation for a prior lawful act . . . ." It is a Class D felony if "the threat is to commit a forcible felony." I.C. § 35-45-2-1(b)(1)(A).

Johnson compares the circumstances in the instant case to those in *Casey v. State*, 676 N.E.2d 1069 (Ind. Ct. App. 1997). In *Casey,* the victim, Kimberly Williamson ("Williamson"), went to a bar with several friends, where she ran into the defendant, Casey. *Id.* at 1071. At the bar, Casey and another man started a fight with one of Williamson's friends, which escalated to the point that they had to leave the bar. *Id.* Later, Williamson had returned to her home and started to watch television with her boyfriend and a friend when Casey appeared on her ledge outside her window. *Id.* Casey

17

told Williamson he was going to kill her, her boyfriend, and her friend, and then struck her boyfriend with a baseball bat. *Id.* The State subsequently convicted Casey of Class C felony intimidation for his actions, but this Court vacated the conviction. *Id.* at 1074. We held that the State did not clarify which of Williamson's lawful acts had instigated Casey's threats, even though it had advanced several plausible prior acts, such as Williamson being a patron at a bar, being at her house, and being a witness to Casey's attack on her boyfriend. *Id.* at 1073. We found it persuasive that Casey's threats "[did] not demonstrate his reasons for threatening [Williamson] or indicate that he was doing so because of any specific prior act." *Id.*

Johnson now claims that, as in *Casey*, the State did not clarify which of I.B.'s prior lawful actions instigated his retaliation. We disagree. In its information, the State charged that Johnson:

> on or about January 4, 2013, did communicate to [I.B.], another person, a threat to commit a forcible felony, that is: threatened to kill [I.B.], with the intent that [I.B.] be placed in fear of retaliation for a prior lawful act, said prior lawful act being her decision to be somewhere other than her residence prior to being confronted by [Johnson].

(App. 31). In support of this charge, I.B. testified that when she returned home from being somewhere other than her residence, Johnson got up and "started going crazy," accusing I.B. of cheating on him with their neighbor. (Tr. 17). In response to Johnson's physical violence, I.B. told him that she had not cheated on him, which indicates that she attributed Johnson's actions to her absence all day. Johnson also, in the midst of punching and kicking I.B., told her to call the people with whom she had spent the day in order to prove that she had not been cheating on him. In light of these facts, we conclude

18

that the State produced sufficient evidence of I.B.'s prior lawful act of spending the day outside of her residence to support Johnson's conviction for intimidation.

Affirmed.

MATHIAS, J., concurs.

BRADFORD, J., concurs in result with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

MICHAEL JOHNSON,                          )
                                          )
    Appellant-Defendant,              )
                                          )
    vs.                               )      No. 49A02-1307-CR-562
                                          )
STATE OF INDIANA,                         )
                                          )
    Appellee-Plaintiff.               )

**BRADFORD, Judge, concurring in result**

I agree with the majority that Johnson has waived any argument he might have had concerning I.B.'s testimony about her sexual history with Johnson. I would reach that conclusion, however, on the more fundamental basis that Johnson made no offer of proof as to what I.B.'s testimony would have been. *See Nunn v. State*, 450 N.E.2d 495, 497 (Ind. 1983) ("Furthermore, Appellant made no offer to prove when the trial court sustained the State's objection to said question. Appellant accordingly waived this issue and we will not consider it."). Ruling on the theoretical admissibility of I.B.'s testimony involves assuming, at the very least, that it would have been relevant, an assumption for which the record provides no basis. That said, I concur with the majority's disposition of Johnson's appeal in all other respects.