## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 20 2018, 8:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kevin Jay Watkins,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

November 20, 2018

Court of Appeals Case No.
18A-CR-1153

Appeal from the Marion Superior Court

The Honorable Grant W. Hawkins, Judge

Trial Court Cause No.
49G05-1512-MR-46091

**Baker, Judge.**

[1] Kevin Jay Watkins was convicted of two counts of Murder.[1] He appeals, arguing that the trial court erred by admitting certain evidence, that there was insufficient evidence to support his convictions, and that his sentence is inappropriate in light of the nature of the offenses and his character. Finding no error and that his sentence is not inappropriate, we affirm.

## Facts

[2] On December 18, 2015, burglars broke into Watkins's house and stole four guns and a television. Watkins reported the crime to the police and indicated that he believed two kids in the neighborhood committed it, but he did not identify any suspects. On December 20, 2015, Watkins confronted X.T., a teenage boy in the neighborhood, about the burglary. During the confrontation, Watkins was armed and wearing a badge when he handcuffed X.T., accused him of burglarizing Watkins's home or knowing who did, and threatened X.T. that if Watkins's property was not returned, "it's going to be a blood bath by Christmas." Tr. Vol. V p. 112.

[3] Around the same time, Watkins confronted fifteen-year-old Satori Williams's girlfriend about the burglary, threatening that if he did not get his property back, "there will be a blood bath on Christmas Eve." Tr. Vol. II p. 97. Then, on December 22, 2015, Watkins tried to intervene in an armed robbery investigation at a nearby fast-food restaurant; he wanted to review the

---

[1] Ind. Code § 35-42-1-1.

surveillance footage because he believed the teenagers he suspected of burglarizing his home may have been involved in the robbery.

[4] On Christmas Eve 2015, Williams and sixteen-year-old Timmee Jackson were walking to visit friends, but they never arrived at their destination. At some point, their families and friends began calling the boys' cell phones and searching the neighborhood. During the search, Williams's mother stopped at Watkins's house because the boys' route that night would have taken them directly past it; the boys also could have taken a shortcut through his yard to reach their destination. Watkins's wife told Williams's mother that they did not know anything about the missing boys. Williams's mother did not see Watkins or his Chevrolet Suburban that night.

[5] When the search resumed the next morning, Williams's mother and sister returned to Watkins's house. Watkins's Suburban was in the driveway, and Watkins was outside. When Williams's sister asked where Williams was, Watkins said that he had never met him. He also spoke about the burglary and how the neighborhood kids were trouble. During the conversation, Williams's mother and sister noticed a large amount of blood on the grass, leaves, and sidewalk of Watkins's front yard. When Williams's mother asked about it, Watkins suggested it belonged to a wild animal. Williams's mother put a bloody leaf in a plastic bag and called the police as soon as she left.

[6] A police officer arrived at Williams's mother's home later that morning; his mother reported her son missing, showed the officer the bloody leaf she had

taken from Watkins's yard, and gave him Watkins's address. The officer went to Watkins's house; Watkins was outside with a cleaning bucket. The officer observed blood on the leaves in the yard and blood on the porch and doorframe, and he smelled a strong odor of bleach as he approached the front door. When back-up officers arrived, they discovered drag marks in the leaves with a trail of blood leading from the front of the house to the backyard to an abandoned house next door. The blood was later confirmed through DNA analysis to belong to Williams and Jackson.

[7] Police learned that Watkins owned a bail-bond business located in a strip mall on Massachusetts Avenue. Police went there, and while looking inside the dumpster behind the business, they saw a 4.5-millimeter caliber black BB gun, a red and black flannel shirt, dark jeans, and a large pair of shoes that were the same size that Watkins had in his home. The jeans and shoes were covered in mud and blood; later testing revealed that the blood belonged to the two teenage boys.

[8] Surveillance footage recovered from a nearby business showed Watkins's Suburban driving into his business's parking lot at 8:30 p.m. on Christmas Eve and 3:48 a.m. on Christmas Day. Watkins was photographed carrying a shovel, changing his clothes, and putting items in the dumpster, including a pair of pants. After obtaining a search warrant for Watkins's business, police found blood inside; again, this blood was later discovered to belong to the boys.

[9]     Police also searched Watkins's vehicle. The carpet in the back of the SUV was stained with blood. A bottle of bleach was next to a large garbage bag, which was stuffed with blood-soaked leaves, the packaging for a tactical tomahawk, a bone chip from one of the boy's skulls, brain matter, and what was later determined to be Williams's severed finger. The garbage bag also contained blood-soaked clothing and shoes that matched what the boys were wearing when last seen on Christmas Eve; Williams's sweatshirt and t-shirt had slashes in the back and shoulder from a sharp-edged object.

[10]    On December 26, 2015, Watkins was arrested for the murders of Williams and Jackson. While being transported, Watkins said, "those kids were a bunch of gangsters, I knew I should have left them alone, now I'm going to jail." Tr. Vol. V p. 222. On December 29, 2015, the State charged Watkins with two counts of murder.

[11]    On February 22, 2016, a fisherman found Jackson's body in a shallow grave next to a retention pond close to Watkins's business. A tomahawk was recovered from the bottom of the retention pond that matched the packaging for the tactical tomahawk found in Watkins's vehicle. On April 10, 2016, Williams's body was found buried in a shallow grave in a field in Shelby County.

[12]    At some point after the discovery of the bodies, police obtained a warrant for Watkins's cell phone records, which indicated his cell phone location on Christmas Eve and Christmas Day. His cell phone connected to cell phone

towers near where each body was discovered. The records revealed that sometime between 9:22 p.m. and 10:36 p.m. on Christmas Eve, Watkins changed the date on his cell phone from December 24 to December 13.

[13] Autopsies of the bodies confirmed that their deaths had been caused by multiple chop wounds to their heads. Their injuries were nearly identical and were located on the side and rear of their bodies; neither body had any wounds on the front. The forensic pathologist concluded that both boys sustained more than one incapacitating blow and that the size of the chop wound injuries were consistent with the size of the blade on the tactical tomahawk recovered from the retention pond.

[14] Before trial, the State filed a notice of intent to offer evidence pursuant to Indiana Evidence Rule 404(b), seeking to introduce testimony regarding Watkins's confrontation of X.T. This testimony included the facts that, on December 20, 2015, Watkins went to X.T.'s residence; that Watkins spoke to X.T. about the burglary of his house; that Watkins was armed and handcuffed X.T.; that Watkins presented himself as a law enforcement officer before identifying himself as a bail bondsman; and that Watkins said, "if the guns don't come up it's going to be a bloodbath." Appellant's Conf. App. Vol. II p. 207. A pretrial hearing took place, during which Watkins objected to the admission of this evidence. Following the hearing, the trial court ruled that the State would be permitted to introduce this testimony.

[15] A jury trial took place on February 26 through March 2, 2018. During the trial, over Watkins's objection, Lonzell Ratcliff, who was X.T.'s mentor, testified that on December 20, 2015, he went to X.T.'s home to take X.T. to an event and that when he arrived, he saw X.T. had been handcuffed behind his back. Ratcliff had asked Watkins who he was, and Watkins responded that he was an officer, although he later admitted that he was a bondsman. Ratcliff believed that Watkins was a police officer because he was armed with a handgun and was wearing a badge. Watkins claimed that X.T. was either responsible for the burglary of his home or that he knew who was. Ratcliff testified that Watkins threatened X.T. that if Watkins's property was not returned, "it's going to be a blood bath by Christmas." Tr. Vol. V p. 112. Watkins then released X.T. from the handcuffs and left the residence.

[16] Watkins also testified at trial and admitted to killing the boys with his tomahawk, but he claimed that he had done so in self-defense. He said that in the days following the burglary of his house, he feared that he was under attack. When he was in his front yard on Christmas Eve, two people came running around the corner toward him and that one of them pulled out and pointed a black gun at him. He reached for the tactical tomahawk on his belt and began striking that person. He then testified that the other person tried to grab him during the altercation and that because he feared that the second person may also have been armed, he started striking the second person with the tomahawk as well. Watkins said that he did not see a weapon in the second person's hand before he began striking him with the tomahawk.

[17] Watkins claimed that he could not recall how many times he struck the boys or where he struck them. He testified that after he killed them, he thought about calling the police but decided against it. Instead, he dragged the bodies into his backyard and then to the abandoned house next door before putting them in his vehicle, driving to his business, and eventually burying them where they were later discovered. He testified that he had tossed the tomahawk in the retention pond and disposed of the items found in the dumpster behind his business; that he bought a new shirt at a nearby gas station; that he put the items found in the garbage bag in his vehicle in that bag; and that he was trying to clean up the scene when the police arrived on Christmas Day.

[18] The jury found Watkins guilty as charged. A sentencing hearing took place on April 20, 2018, during which the trial court sentenced him to two consecutive 55-year terms, for an aggregate term of 110 years. Watkins now appeals.

## Discussion and Decision

[19] Watkins raises three issues on appeal: 1) that the trial court erred by admitting certain evidence in violation of Indiana Evidence Rule 404(b); 2) that the evidence was insufficient to support his convictions because it failed to disprove his defense of self-defense; and 3) the sentence was inappropriate in light of the nature of the offenses and his character.

## I. Admission of Evidence

[20] Watkins first contends that the trial court erred by admitting evidence about his confrontation with X.T. The admission and exclusion of evidence falls within

the trial court's sound discretion, and we will reverse only if the decision is clearly against the logic and effect of the facts and circumstances before it. *Johnson v. State*, 6 N.E.3d 491, 498 (Ind. Ct. App. 2014).

[21]     Watkins contends that the admission of this evidence violated Indiana Rules of Evidence 403 and 404(b). Rule 404(b) states as follows:

> (b) Crimes, Wrongs, or Other Acts.
>
>> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>>
>> (2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
>>
>>> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
>>>
>>> (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

Watkins contends that even if the evidence was admissible under Rule 404(b), its prejudicial effect outweighed its probative value such that it should have been excluded under Rule 403. Rule 403 provides that the trial court "may

exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

[22] The main issue at trial was whether Watkins was acting in self-defense when he killed Williams and Jackson. Watkins admitted to committing the murders but argued that he was defending himself. The intent exception to Rule 404(b) is "'available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent.'" *Evans v. State*, 727 N.E.2d 1072, 1079 (Ind. 2000) (quoting *Wickizer v. State*, 626 N.E.2d 795, 799 (Ind. 1993)). When a defendant alleges a particular contrary intent at any time during trial, "'the State may respond by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense.'" *Id.*

[23] During the trial, Ratcliff testified about Watkins's confrontation with X.T. His testimony was offered not to show that Watkins had a criminal propensity and therefore murdered the boys, but rather to show that he had intent to attack teenage boys in the neighborhood and to disprove his self-defense claim. Ratcliff's testimony established that in the days between the burglary of Watkins's home and Christmas Eve, Watkins was pursuing teenage boys to determine who had burglarized his house. When Watkins confronted X.T., he accused X.T. of committing the crime or of knowing who did and threatened "a blood bath by Christmas," tr. vol. V p. 112, if his property was not returned.

This prior act evidenced his hostility toward teenage boys. The testimony also rebutted Watkins's claim that Williams and Jackson were the aggressors as it tended to show that Watkins had intent to initiate the attack that resulted in their murders, which is allowed under Rule 404(b). It was not offered to prove his general propensity to commit murder. The trial court did not err by admitting this evidence.

[24] Watkins also contends that even if it was admissible, the prejudicial effect of the testimony substantially outweighed the probative value of the testimony. We disagree. This testimony was highly probative of Watkins's motive and intent to commit the murders. It established that he acted with vengeance, not self-defense. Further, the admission of the evidence was not unfairly prejudicial. The jury was not told that Watkins had been charged with any crimes related to his confrontation of X.T. And considering the other evidence presented during the trial, including Watkins's admission to the crime, testimony from more than thirty witnesses, and the significant amount of forensic evidence, there was little danger that this relatively brief testimony would have inflamed the jury's passions or sympathies.

[25] Finally, Watkins challenges the State's use of the testimony in its closing argument—the State mentioned that Ratcliff found X.T. "in handcuffs" and was "led to believe [Watkins was] a police officer," tr. vol. VI p. 178, and that Watkins "was targeting kids, much smaller kids, kids that he could intimidate, get information out of," *id.* at 194—arguing that such statements were invitations for the jury to draw a forbidden inference. But these two statements

were a minimal part of the State's lengthy closing argument, and, again, in light of all the evidence the State discussed during its closing argument, we do not find that the brief references to Ratcliff's testimony would unfairly prejudice the jury against him. Watkins's argument is unavailing.

## II. Sufficiency of the Evidence

[26] Next, Watkins argues that the evidence was insufficient to support the convictions because it failed to show that he did not act in self-defense. When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the conviction and will neither assess witness credibility nor reweigh the evidence. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We will affirm unless no reasonable factfinder could find the elements of the crime proved beyond a reasonable doubt. *Id.*

[27] To convict Watkins of murder, the State was required to prove beyond a reasonable doubt that Watkins knowingly or intentionally killed another human being. I.C. § 35-42-1-1. On appeal, Watkins does not contend that the evidence fails to support the statutory elements; indeed, Watkins admitted to killing Williams and Jackson. Instead, he argues that the State failed to disprove his claim of self-defense.

[28] To prevail on a claim of self-defense, a defendant must show that he was in a place where he had a right to be; did not provoke, instigate, or participate willingly in the violence; and had a reasonable fear of death or great bodily

harm. *Wilson v. State*, 770 N.E.2d 799, 800 (Ind. 2002); *see also* Ind. Code § 35-41-3-2. When a self-defense claim is raised and finds support in the evidence, the State bears the burden of negating at least one of the necessary elements beyond a reasonable doubt. *Wilson*, 770 N.E.2d at 800. The State may meet its burden by offering evidence directly rebutting the defense, affirmatively showing that the defendant did not act in self-defense, or by relying on the sufficiency of the evidence from its case-in-chief. *Miller v. State*, 720 N.E.2d 696, 700 (Ind. 1999). If a defendant is convicted despite a claim of self-defense, we will reverse only if no reasonable person could say that self-defense was negated beyond a reasonable doubt. *Wilson*, 770 N.E.2d at 801.

[29]     Here, the record contains the following evidence supporting Watkins's convictions:

- Following the burglary of his home, Watkins confronted teenagers in his neighborhood about the burglary. He handcuffed and threatened X.T. about the crime, warning that if his property was not returned, "it's going to be a blood bath by Christmas." Tr. Vol. V p. 112. Watkins also told Williams's girlfriend that if he did not get his property back, "there will be a blood bath on Christmas Eve." Tr. Vol. II p. 97.
- Watkins tried to intervene in an armed robbery investigation at a nearby fast-food restaurant, requesting to review the surveillance footage because he believed that the teenagers he suspected of burglarizing his home may have been involved in that armed robbery.
- After being arrested, Watkins said that, "those kids were a bunch of gangsters, I knew I should have left them alone, now I'm going to jail." Tr. Vol. V p. 222.
- The forensic evidence established that Watkins delivered fourteen chop wound injuries to the back and sides of the boys' heads, and one chop

wound injury to Williams's back. There were no wounds on the front of either of the boys' bodies.

- Watkins sustained no injuries.
- The evidence indicated that Watkins continued to attack the boys even after they had fallen to the ground. The forensic pathologist testified that each victim sustained more than one incapacitating chop wound injury, any one of which could have caused them to fall to the ground unconscious.
- Following the attack, Watkins did not contact police, instead burying the bodies in two remote locations.
- Watkins took significant steps to cover his tracks, including throwing the boys' clothing and possessions into a dumpster, tossing the murder weapon in a retention pond, changing into new clothes, disabling the boys' cell phones, changing the date on his own cell phone, and attempting to clean the blood from his yard and sidewalk with bleach.

[30]     Watkins is correct that there is some evidence in the record supporting his claim of self-defense; primarily, it is his own testimony. But from the evidence above, a reasonable juror could have determined that Watkins was not under any threat at the time of the attack, much less a reasonable fear of imminent use of unlawful force. Further, a reasonable juror easily could have inferred that Watkins acted with unjustified aggression, rather than self-defense, based on his repeated use of a deadly weapon. Finally, a reasonable juror could have found from the totality of the evidence presented by the State—including Watkins's words and actions before and after the murder, the location of the boys' injuries, and the number of blows inflicted—that the State sufficiently refuted Watkins's claim of self-defense. Watkins's argument amounts to a request that we reweigh the evidence and second-guess the jury's assessment of witnesses. We decline to do so. The evidence is sufficient to support the convictions.

# III. Sentence

[31]    Finally, Watkins contends that the sentence imposed by the trial court is inappropriate in light of the nature of the offenses and his character and that we should revise his sentence pursuant to Indiana Appellate Rule 7(B). We must "conduct [this] review with substantial deference and give 'due consideration' to the trial court's decision—since the 'principal role of [our] review is to attempt to leaven the outliers,' and not to achieve a perceived 'correct' sentence . . . ." *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014) (quoting *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013)) (internal citations omitted).

[32]    Watkins was convicted of two counts of murder, for which he faced a sentence of forty-five to sixty-five years imprisonment, with an advisory term of fifty-five years. Ind. Code § 35-50-2-3. He received two advisory, consecutive 55-year sentences, for an aggregate of 110 years, for these convictions. Had the maximum consecutive sentences been imposed, he would have received a term of 130 years.

[33]    With respect to the nature of the offenses, Watkins attacked two teenage boys on Christmas Eve simply because they had the misfortune of crossing his path that evening. He brutally and repeatedly struck them from behind with a tactical tomahawk, inflicting multiple injuries to their bodies, and then buried their bodies in remote areas. The next day, Watkins was attempting to clean his property to remove evidence when police approached. Nothing about the appalling nature of this offense renders his sentence inappropriate.

[34] With respect to Watkins's character, we note first that, after his house was burglarized, he began a vengeful pursuit of teenagers in his neighborhood, threatening multiple people that if his items were not returned to him, there would be a blood bath around Christmas. As a result of his confrontation with X.T., which was part of this pursuit, he was charged with Level 3 felony criminal confinement and Level 6 felony impersonation of a public servant. He also tried to intervene in a police investigation of an armed robbery. His fixation on catching the burglars ended with the violent slaying of two teenage boys.

[35] Watkins points out that he had lived a relatively stable, productive life, both professionally and personally, before he committed these murders. But Watkins's actions demonstrate a disturbing lack of respect for human life and for the law. We do not find that his character aids his appropriateness argument. In sum, we find that the sentence is not inappropriate in light of the nature of the offenses and his character.

[36] The judgment of the trial court is affirmed.

May, J., and Robb, J., concur.