## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 09 2020, 8:25 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

James H. Voyles, Jr.
Tyler D. Helmond
Voyles Vaiana Lukemeyer Baldwin & Webb
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

F. Aaron Negangard
Chief Deputy Attorney General

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jordan Collins, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff,* | April 9, 2020 <br><br> Court of Appeals Case No. 19A-CR-1563 <br><br> Appeal from the Hancock Circuit Court <br><br> The Honorable Cody B. Coombs, Court Commissioner <br><br> Trial Court Cause No. 30C01-1801-F5-36 |

**Robb, Judge.**

# Case Summary and Issues

[1]     Following a bench trial, Jordan Collins was found guilty of two counts of sexual misconduct with a minor, one each as a Level 5 and a Level 6 felony; and rape, a Level 3 felony. The trial court entered judgments of conviction for Level 6 felony sexual misconduct and rape and sentenced Collins to an aggregate sentence of eight years. Collins appeals and presents two issues for our review: (1) whether Collins personally, knowingly, intelligently, and voluntarily waived his right to a jury trial; and (2) whether there was sufficient evidence to support his rape conviction. Concluding Collins' waiver of a jury trial was personal, knowing, intelligent, and voluntary, and the State presented sufficient evidence to support Collins' rape conviction, we affirm.

# Facts and Procedural History

[2]     The facts most favorable to the trial court's judgment are as follows. H.D.'s parents are separated, and she has an older brother named Landon, who is in the Army. H.D. lives primarily with her father, Shane, in Lawrence, Indiana, and her mother, Cindy, lives in Fortville. In December 2017, Landon came home for several weeks to visit over the holidays.

[3]     On December 31, Landon hosted a New Year's Eve party at their mother's house. H.D. had turned fourteen years old only three weeks prior. That evening, around 5:00 or 6:00 p.m., H.D.'s father dropped her off at her mother's house for the party. Shortly thereafter, two of H.D.'s girlfriends from

school arrived and the three of them got ready for the party. Around 7:30-8:00 p.m., Landon and Collins arrived. Landon and Collins had been friends for approximately ten years; H.D. had known Collins that long as well. Other friends arrived later, and Cindy and her boyfriend were also present during the party. There were roughly fifteen guests and "[p]eople started drinking and they were just hanging out[.]" Transcript of Evidence, Volume II at 23.

[4] During the party, H.D. "had a sip of champagne, . . . a few sips of beer, and two or three shots of tequila." *Id.* at 39. She also witnessed Collins consume alcohol, including beer, Captain Morgan, champagne, and "something in a shot glass." *Id.* Everyone gathered in the living room to watch the ball drop at midnight. After the ball dropped, most guests left but H.D. and her two girlfriends hung out in her room for a while. Around 12:30 a.m., January 1, Landon went to bed and Cindy and her boyfriend left to go to a nearby bar. H.D., her two friends, a male friend, and Collins hung out in the kitchen and talked. While they were in the kitchen, Collins told H.D. "that [she] was like a sister to him and that he cared about [her] and . . . [told their male friend] that if he did anything to any of [the] girls that he would beat the crap out of him." *Id.* at 42.

[5] At some point, Collins texted H.D. his phone number and told her if she ever needed to talk to him while Landon is away, she could. Then, H.D. recalled Collins announcing to everyone in the kitchen, "me and [H.D.] are going to go outside to talk, don't come out there until I say you can come in." *Id.* at 45. Collins told H.D. he wanted to speak with her about Landon leaving, so they

walked into the garage. Upon entering the garage, Collins kissed H.D., then sat in a chair, and told her to "straddle him[.]" *Id.* at 46. H.D. said no. She sat on Collins' lap "for a second[,]" then stood in front of him, and he tried to pull her pants down but she resisted. *Id.* at 47.

[6] H.D. recalled that "eventually [Collins] stood up and somehow we ended up over by the fridge and I was like pushed up against it and [Collins] kept telling me that I needed to suck his d*** and I said no. And then [Collins] kept pulling my pants down and I was holding them up." *Id.* at 46. Collins managed to pull H.D.'s pants down a few inches, then put his hands down her pants, and inserted several fingers inside her vagina for ten to fifteen seconds. H.D. told Collins, "[S]top[,] it hurts[,]" but Collins did not respond and did not stop. *Id.* at 49. At some point after H.D. refused him, Collins grabbed her hair and pulled her head back, and while pinning her against the refrigerator, Collins grabbed her hand and placed it on his exposed erect penis. Collins touched H.D. with his penis and unsuccessfully attempted to penetrate her. Collins told H.D., "I'm going to d*** you down now or I'm going to do it later." *Id.* at 52. During the encounter, H.D. repeatedly told Collins to stop and said "no." H.D. did not attempt to flee because she was afraid Collins would harm her or hurt someone else if she disclosed the incident to anyone in the house.

[7] Hearing Cindy returning from the bar, Collins stopped and sat down in a chair. H.D. returned to her room where her friends were and told them she thought Collins had just raped her. At some point, Collins left the house. Later that day, H.D. disclosed the incident to Landon via Snapchat but stated she did not

want the police involved. On January 2, Officer Matt Fox of the Fortville Police Department received a report from the Department of Child Services child abuse hotline indicating that H.D. had been sexually assaulted. Officer Fox reached out to H.D.'s father, who brought H.D. to the police station to be interviewed. After speaking with the police, H.D. then went to St. Vincent's hospital in Anderson and underwent a sexual assault examination.

[8] On January 4, 2018, the State charged Collins with the following: Count I, sexual misconduct with a minor, a Level 5 felony; Count II, sexual misconduct with a minor, a Level 6 felony; and Count III, criminal confinement, a Level 6 felony. Later, the State filed a motion to amend the information by adding Count IV, rape, a Level 3 felony. The trial court granted the motion, and Count IV was added.

[9] On February 15, 2019, Collins filed a Waiver of Jury Trial, which he personally signed, along with his attorney. The short waiver stated, "Comes now defendant in person and by counsel and hereby waives trial by jury and requests this matter be scheduled for bench trial[.]" Appendix to Appellant's Brief, Volume Two at 62. A bench trial was held on June 5, 2019, and the trial court found Collins guilty of both counts of sexual misconduct with a minor and rape, and not guilty of criminal confinement. The trial court merged Counts I and II and sentenced Collins to serve two years in the Indiana Department of Correction ("DOC") on Count II, concurrent with eight years on Count IV– four of which were to be executed in the DOC, two years with community corrections, and two years suspended to probation. Collins now appeals.

# Discussion and Decision

## I.  Waiver of Jury Trial

"The jury trial right is a bedrock of our criminal justice system, guaranteed by both Article 1, Section 13 of the Indiana Constitution and the Sixth Amendment to the United States Constitution." *Horton v. State*, 51 N.E.3d 1154, 1158 (Ind. 2016).  It is fundamental and personal and therefore any waiver of the right to a jury trial must be the knowing and voluntary choice of the defendant himself.  *Perkins v. State*, 541 N.E.2d 927, 928 (Ind. 1989); *see also* Ind. Code § 35-37-1-2 (stating that "the *defendant* and prosecuting attorney, with the assent of the court, may submit the trial to the court") (emphasis added). "A voluntary waiver occurs if the conduct constituting the waiver is the product of a free will; a knowing waiver is the product of an informed will; [and] an intelligent waiver is the product of a will that has the capacity to understand[.]" *Johnson v. State*, 6 N.E.3d 491, 496 (Ind. Ct. App. 2014) (internal quotation omitted).

A knowing, voluntary, and intelligent waiver of the right to a jury trial cannot be inferred from a record which does not evidence such personal choice.  *Boykin v. Alabama*, 395 U.S. 238, 243 (1969); *Poore v. State*, 681 N.E.2d 204, 206 (Ind. 1997).  Rather, the defendant must personally indicate either in writing *or* verbally in open court that he or she wishes to waive a jury trial and the waiver must be made part of the record.  *Kellems v. State*, 849 N.E.2d 1110, 1112-13 (Ind. 2006) (reh'g opinion).  There is no requirement that a trial court orally

advise a defendant of his right to a jury trial and the consequences of waiving that right. *Coleman v. State*, 694 N.E.2d 269, 278 (Ind. 1998).

[12] Collins argues that the waiver of jury trial filed with the trial court does not establish that he personally communicated a knowing, intelligent, and voluntary waiver because the actual waiver fails to indicate that he can read or write and that he understands what a jury trial is and its function. We disagree.

[13] In *Poore v. State*, our supreme court held that the defendant in that case made a personal, knowing, intelligent, and voluntary waiver of a jury trial in circumstances similar to those in the instant case. 681 N.E.2d at 208. In *Poore*, after the defendant had been criminally charged, he was given an initial hearing rights form explaining the right to a jury trial, which he signed and dated. Later, at a pre-trial hearing, the defendant filed a written waiver of jury trial, signed by him, his attorney, and the deputy prosecuting attorney. Our supreme court concluded that the defendant's "filing of his signed jury trial waiver adequately reflect[ed] a personal desire to waive this right and constitute[d] the affirmative act necessary to do so for his felony charge." *Id.* at 207.

[14] The court further held that the evidence in the record established that the defendant made an intelligent and voluntary waiver. First, the defendant had been given an initial hearing rights form, which "inform[ed] him generally and unambiguously" of his right to jury trial. *Id.* Second, the "record provide[d] multiple grounds for *inferring* that [he] understood the proceedings and the choices he made." *Id.* (emphasis added). The presentence investigation report

indicated that the defendant completed school through eleventh grade, later obtained his G.E.D., and attended two years of undergraduate education; the record of the initial hearing reflected a "literate exchange" between the defendant and the court regarding a no contact order; and the defendant's significant criminal history suggested a "high level of familiarity with the judicial process, making it quite likely that he knew what a 'jury' was." *Id.* In addition, the record revealed that the defendant's attorney also signed the waiver, "impl[ying] that [he] acted upon advice and information of legal counsel." *Id.* Lastly, our supreme court rejected the notion that the record must show that a defendant could read and understand his or her rights: "While it is advantageous for a trial judge to engage a defendant in colloquy concerning the consequences of waiving trial by jury, such an exchange is 'not required by either the United States or the Indiana constitutions, or by statute.'" *Id.* at 208 (quotation omitted). Therefore, the court held the defendant made a personal, knowing, voluntary, and intelligent waiver.

[15] Such is the case here. Collins personally signed his waiver of jury trial, and this is sufficient to establish that his waiver was personal. The record also supports a knowing, voluntary, and intelligent waiver. First, Collins appeared in person and with counsel at the initial hearing on January 4, 2018. *See* App. to Appellant's Br., Vol. Two at 3. The trial court's Summary of Order for Initial Hearing indicated that during the hearing, the trial court advised him that he has (among other things) "the right to a speedy, public trial, by jury in the

county in which the offense was allegedly committed." *Id.* at 28. The trial court also initially scheduled a jury trial for July 26, 2018. *Id.*

[16] The record also provides several grounds for inferring Collins knowingly, voluntarily, and intelligently waived his right to a jury trial. Notably, Collins' written waiver was filed far into the case, on February 15, 2019, over a year after the State initially filed the charges. And in addition to the initial hearing, the record demonstrates that over this period of time, the trial court had several opportunities to communicate with Collins in person to know whether he could read, write, and understand English. *See id.* at 5, 7 (chronological case summary indicating Collins appeared in person and by counsel for a final pre-trial conference on May 10, 2018, as well as a change of plea hearing on July 12, 2018). Although Collins does not have a criminal history, his presentence investigation report reveals he has a high school education. *Id.* at 75-77. Critically, Collins' attorney also signed his waiver, implying that he acted upon the advice of his counsel. As the *Poore* court explained, "a defendant's understanding [of waiver of a jury trial] may be inferred when he and his attorney both sign a written waiver of the jury trial right and file it in open court. The evidence tends to show that [the defendant] could read and that he thus had the ability to understand the short waiver form he signed." 681 N.E.2d at 207.

[17] Based on the evidence in the record, we conclude that Collins personally and knowingly, voluntarily, and intelligently waived his right to a jury trial.

## II. Sufficiency of the Evidence: Rape

[18] Our standard of reviewing a sufficiency claim is well-settled. *Brent v. State*, 957 N.E.2d 648, 649 (Ind. Ct. App. 2011), *trans. denied*. We do not reweigh the evidence or assess the credibility of the witnesses. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences supporting it. *Id.* Therefore, the evidence need not overcome every reasonable hypothesis of innocence. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007). "[W]e will affirm the conviction unless no reasonable trier of fact could have found the elements of the crime beyond a reasonable doubt." *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011).

[19] To convict Collins of rape, the State had to prove beyond a reasonable doubt that Collins knowingly or intentionally caused H.D. to submit to other sexual conduct[1] when H.D. was compelled by force or imminent threat of force. Ind. Code § 35-42-4-1(a)(1); Ind. Code § 35-41-4-1(a) ("A person may be convicted of an offense only if his guilt is proved beyond a reasonable doubt."). The force necessary to sustain a rape conviction need not be physical; it may be constructive or implied from the circumstances. *Jones v. State*, 589 N.E.2d 241, 242-43 (Ind. 1992).

---

[1] Indiana Code section 35-31.5-2-221.5 defines "other sexual conduct" as an act involving "a sex organ of one (1) person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object."

[20] Collins argues that our appellate courts have considered the compulsion by force element many times and "in almost every case the force was significantly greater than what [was] involved" in this case. Appellant's Brief at 11. He argues that the State failed to prove this element because Collins did not use a weapon during the offense, there were "no detectable injuries found during [H.D.'s] sexual assault examination, or any evidence . . . of male DNA[,] H.D. did not object to kissing[, s]he never made any attempt to leave the garage, and Collins never told her she couldn't leave the garage." *Id.* at 12 (record citations omitted). We disagree.

[21] At trial, H.D. testified that when she and Collins walked into the garage, he kissed her, tried to take her pants off, and then pinned her against the refrigerator and at some point, instructed her to "suck his d***[.]" Tr., Vol. II at 46. Collins tried to pull her pants down as H.D. tried to hold them up. Despite H.D.'s refusal, Collins put his hands down her pants and inserted several fingers into her vagina. H.D. told Collins that it hurt and to stop. Collins grabbed H.D.'s hair and pulled her head back, grabbed her hand, and placed it on his erect penis. He then touched her with his penis and attempted to penetrate her. During the encounter, H.D. repeatedly told Collins "no" and asked him to stop. In addition, documentation from H.D.'s sexual assault examination was admitted into evidence and indicated the following information provided by H.D.: "[Collins] kept pulling my hair – he tried to choke me – he put his hand on my throat for a second[;] I had a hard time breathing[.]" Exhibits, Volume IV at 33.

In sum, although Collins did not use a weapon, he physically pinned H.D. to the refrigerator, pulled her pants down as she tried to keep them up, grabbed her by the hair, penetrated her, and choked her – all while H.D. repeatedly said no and asked him to stop. This is sufficient evidence establishing Collins' use of physical force to compel H.D. to submit to sexual conduct.

# Conclusion

We conclude that Collins personally, knowingly, voluntarily, and intelligently waived his right to a jury trial and there is sufficient evidence to support his rape conviction. Accordingly, we affirm.

Affirmed.

Bradford, C.J., and Altice, J., concur.